IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| GREGORY J. KUDASZ,<br><br>              Plaintiff,<br><br>v.<br><br>MANATRON INC.,<br>GREGORY A. EFFREIN,<br>DOES 1-30, INCLUSIVE,<br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 3:10CV106 |

**ATTACHMENT**


**TO**


**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
TO DISMISS PLAINTIFF'S COMPLAINT**

Unpublished Case Law


Not Reported in F.Supp.2d, 2008 WL 5120622 (M.D.N.C.)
**(Cite as: 2008 WL 5120622 (M.D.N.C.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
M.D. North Carolina.
Claudia P. KREHBIEL, Plaintiff,
v.
Roy COOPER, North Carolina Attorney General, et
al., Defendants.
**No. 1:08CV276.**

Dec. 4, 2008.

Mohammad Omar Baloch, The Law Offices of
Omar Baloch, PLLC, Raleigh, NC, for Plaintiff.

Grady L. Balentine, Jr., N.C. Department of Justice,
Raleigh, NC, for Defendants.

*MEMORANDUM OPINION AND RECOM-
MENDATION OF MAGISTRATE JUDGE
ELIASON*

RUSSELL A. ELIASON, United States Magistrate
Judge.

**\*1** There are a number of pending motions in this
case. First, Defendants move to dismiss the entire
action for lack of jurisdiction, insufficiency of ser-
vice of process, and failure to state a claim upon
which relief may be granted pursuant to Rule
12(b)(1), (5), and (6) of the Federal Rules of Civil
Procedure. Plaintiff, in turn, seeks to cure the al-
leged defects in her complaint through (1) her
second motion to amend the caption pursuant to
Rule 15, and (2) her amended motion to add a ne-
cessary party and for leave to amend the verified
complaint pursuant to Rules 7, 15, 19, and 21.
However, as will be seen, all these motions are
moot because of actions taken by the state court
while this matter has been pending.

The pertinent facts are as follows. Plaintiff is the
mother and sole physical custodian of "AP," a
minor child. She shares legal custody of AP with
the boy's father, Eduardo Ramierez Barreto
("Ramierez"), who resides in Colombia, and both
are Colombian citizens by birth, as is AP. After
Plaintiff and Ramierez dissolved their relationship,
Plaintiff moved to the United States, where she
married and gained permanent resident status.FN1
AP joined her in this country in 2002 and is also a
permanent resident.

> FN1. Plaintiff and Ramierez were in a
> four-year relationship in the mid-1990s,
> but never married.

At the time the parties filed their pending motions,
Ramierez and Plaintiff had long been involved in
an action in North Carolina state court which
sought to resolve various custody and visitation is-
sues regarding AP. While certain issues, including
custody, were ultimately resolved by consent order,
the matter of visitation remained in dispute. Spe-
cifically, Plaintiff objected to AP's visiting his fath-
er in Colombia, or anywhere else outside the United
States, on the ground that AP might be detained
there by Ramierez or kidnaped by a third party.

In filing her present lawsuit under 42 U.S.C. § 1983
, Plaintiff suggests that, in a child custody or visita-
tion case involving a person who lives outside of
this country, the federal government has the right
and responsibility to determine the issue because
federal immigration laws control the outcome and
preempt state law. In particular, she alleges that a
lengthy absence from the United States could po-
tentially result in a change to AP's permanent resid-
ent status or prevent him from re-entering the coun-
try altogether. This could occur, according to
Plaintiff, even if the child is kidnaped or otherwise
forcibly kept outside the United States. For author-
ity, she cites 8 U.S.C. § 1101(a)(3)(ii), which does
not speak to a person being forcibly kept outside
the United States, but only a voluntary absence.
Nevertheless, she seeks to permanently enjoin the

North Carolina state courts from holding a hearing, trial, or entering any order which would direct AP to travel outside of the United States by contending that such an order would amount to "de facto deportation."

During the pendency of the parties' motions, the underlying state court case between Plaintiff and Ramierez was resolved without the issuance of "an objectionable" visitation order. Defendants now contend that this turn of events moots Plaintiff's federal claims since no actual controversy remains. Plaintiff counters that nothing precludes the issue of international visitation from being raised again in the future, and asks that this Court assert "the federal government's exclusive right to make immigration laws and regulations" by permanently enjoining the North Carolina state courts from issuing any such order.

**\*2** Neither party has briefed the issue. Defendants seek to rely on their previously filed motion to dismiss. However, that motion argued the absence of jurisdiction based on the fact that there could be no case or controversy because the State *had not yet* ruled. But, of course, it now has issued a ruling. Plaintiff, on the other hand, offers no legal reason not to dismiss this action, but relies instead on conclusory, emotional appeals. Despite these deficiencies and as will be next discussed, the Court has an obligation to examine jurisdiction on its own whenever that issue presents itself, as it does here. For the reasons stated below, in the present circumstances, the mere possibility of a future order concerning visitation does not constitute an actual controversy sufficient to provide this Court with jurisdiction to entertain the matter. This decision renders all of the parties' pending motions moot.

## Discussion

The doctrine of mootness arises out of the jurisdictional limitations of federal courts. As stated by the court in *Friedman's, Inc. v. Dunlap,* 290 F.3d 191, 197 (4th Cir.2002):

The Constitution limits the jurisdiction of federal courts to actual "Cases" or "Controversies." *See* U.S. Const., art. III, § 2, cl. 1. "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona,* 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (internal quotation marks omitted). The parties did not raise the issue of mootness, but the question of whether we are presented with a live case or controversy is a question we may raise *sua sponte* "since mootness goes to the heart of the Article III jurisdiction of the courts." *Suarez Corp. Indus. v. McGraw,* 125 F.3d 222, 228 (4th Cir.1997). "When circumstances change from the time the suit is filed to the time of appeal, so that the appellate court can no longer serve the intended harm-preventing function or has no effective relief to offer, the controversy is no longer live and must be dismissed as moot." *County Motors v. General Motors Corp.,* 278 F.3d 40, 43 (1st Cir.2002) (internal quotation marks omitted). Generally speaking, one such circumstance mooting a claim arises when the claimant receives the relief he or she sought to obtain through the claim. *See* *Broughton v. North Carolina,* 717 F.2d 147, 149 (4th Cir.1983) (per curiam).

In the present case, Plaintiff succeeded in preventing a visitation order to which she objected. For this reason, there is no live case or controversy. The matter is moot.

To the extent that there is a possibility that the controversy could arise again should the child's father seek modification of the visitation order, that possibility is too slim a reed on which to support a federal lawsuit seeking to enjoin a future state court proceeding. Not only is there an insufficient live case or controversy to support Article III federal jurisdiction, but also the Court may, in its discretion, refuse to decide a case which has become moot. As stated by the treatise writers:

**\*3** Once the Article III threshold has been crossed, adjudication still may be refused on avowedly discretionary grounds. Remedial discretion is often relied upon to determine that the prospective benefit of an injunction, declaratory judgment, or other specific remedy is too slight to justify decision. Closely related concerns also are expressed through a concept of discretionary judicial administration that focuses on the importance of deciding or avoiding decision, and the need to conserve judicial resources.

13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3533.1 at 215 (2d 1984).

Because of the changed circumstances, the Court is effectively without remedial capacity to provide Plaintiff with any measured and reasoned relief. *See id.* § 3533.3. That is, Plaintiff fails to show any present effect or continuing impact arising from the source of Plaintiff's original concern. *Id.* Instead, Plaintiff seeks relief based wholly on an imagined future injury. However, this request is insufficient because Plaintiff would have the Court enter an injunction based on hyperbole, speculation, and fear run rampant. *Id.* These are hardly the bases for constructing any measured relief.

Some litigants have surmounted mootness problems by showing the controversy is "capable-of-repetition-yet-evading review." *Id.* To fall within this exception, two factors must be met:

(1) the challenged action must be in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there must exist a reasonable expectation that the same complaining party will be subjected to the same action again. *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975)(per curiam).

*Kennedy v. Block,* 784 F.2d 1220, 1223 (4th Cir.1986).

In the instant case, Plaintiff makes no showing that her case meets the first factor, and her forecast regarding the second is highly speculative at best. Taking the second factor first, while it is theoretically possible that Ramierez may again, at some point in the future, petition the state courts for international visitation, there is both no factual basis shown as to why he would or how he could do so given the outcome in state court. As for the first factor, there is no reason to believe that the alleged federal issues related to that request could not be fully litigated at that time. Indeed, the Court notes that the recently resolved state court case between Plaintiff and Ramierez was originally filed in 2005, and Plaintiff did not file a federal action challenging the state court's jurisdiction until April 2008. In short, there is no "reasonable expectation" of future immediate harm as to warrant a decision by this Court at the present time.[FN2]

> FN2. Further, Plaintiff provides no guidance as to how this Court could craft an injunction to protect her son in the future, even if it were to find intervention appropriate, except by making a host of speculative assumptions concerning the country where visitation would occur, the wishes of the child, and many other factors subject to variation with the passage of time.

An additional reason not to enter the affray and enter a speculative injunction or declaratory relief lies in the very problematical nature of Plaintiff's request for relief. Her federal claim appears to be without merit. Plaintiff offers no authority for her contention that any visitation order directing her son's travel outside of the United States implicates federal immigration law and violates his federal rights under 42 U.S.C. § 1983. Plaintiff would have federal courts resolve all custody and visitation disputes when one party lives outside of the United States. Her claim of preemption is without any basis in law and she cites nothing on point to support her claim.

**\*4** Issues involving the potential harm to a child as a result of a visitation or custody order generally

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

falls squarely within the purview of the state courts, which have the requisite experience in the area of family law. The federal courts, in contrast, "are courts of limited jurisdiction and generally abstain from hearing child custody matters." *Cantor v. Cohen,* 442 F.3d 196, 202 (4th Cir.2006) (citing *Cole v. Cole,* 633 F.2d 1083, 1087 (4th Cir.1980)). Two exceptions to this rule, international child abduction and wrongful removal claims, are expressly covered by the International Child Abduction Remedies Act ("ICARA") and the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"), neither of which applies in the present case. As the Fourth Circuit explains in great detail in *Cantor,* these statutes only come into play when a child has already been removed or retained in breach of custody rights. *See* 442 F.3d 196, *generally.* They do not address other aspects of a parent's access rights. *See id.* at 206 (noting that appellant could instead pursue her right to access her children by "filing a claim for visitation in state court under the state's visitation law").

In light of these holdings, it would appear that state courts are better suited to, and the proper venue for, considering the risks of kidnaping (parental and/or otherwise) or other dangers in the course of a *proposed* international visit. The state courts take these factors into consideration in deciding whether visitation is proper in the first place. Plaintiff's current speculation that any visit to places outside of the United States will, if long enough, deprive her son of reentry is far too speculative and tenuous to present a basis for this Court to involve itself in determining all of the visitation disputes of AP's parents. And, given the fact that a child grows and the circumstances of both the child and the parents may change through time, it would be rash for a federal court to enter an order now covering a future time based on a past controversy. Under these circumstances, the Court should be reluctant to entertain a controversy that has already ended and with only speculative likelihood that it will arise again in the same way. Accordingly, Plaintiff's claims merit dismissal for lack of jurisdiction both *sua sponte* and

pursuant to Fed.R.Civ.P. 12(b)(1).

**IT IS THEREFORE RECOMMENDED** that this case be dismissed *sua sponte* for lack of jurisdiction, and that all pending motions be denied (except to the extent Defendants' motion to dismiss may be granted if it is read as requesting dismissal based on mootness) and that this action be dismissed.

M.D.N.C.,2008.
Krehbiel v. Cooper
Not Reported in F.Supp.2d, 2008 WL 5120622 (M.D.N.C.)

END OF DOCUMENT

690 S.E.2d 767, 2010 WL 346459 (N.C.App.)
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 690 S.E.2d 767, 2010 WL 346459 (N.C.App.))**



Only the Westlaw citation is currently available.NOTE: THIS OPINION WILL NOT APPEAR IN A PRINTED VOLUME. THE DISPOSITION WILL APPEAR IN A REPORTER TABLE.

An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

Court of Appeals of North Carolina.
Mark A. WARD, Plaintiff,
v.
JETT PROPERTIES, LLC, Defendant.
**No. COA08-1508.**

Feb. 2, 2010.

West KeySummary
**Libel and Slander 237 ⚸6(1)**

237 Libel and Slander
   237I Words and Acts Actionable, and Liability Therefor
      237k6 Actionable Words in General
         237k6(1) k. In General. Most Cited Cases

**Libel and Slander 237 ⚸32**

237 Libel and Slander
   237I Words and Acts Actionable, and Liability Therefor
      237k31 Injury from Defamation
         237k32 k. In General. Most Cited Cases

A tenant failed to state a defamation claim against a property management company. The company sent a letter to the tenant which alleged that the tenant caused problems in his community with other tenants and that the tenant harassed and pestered the company with his frivolous complaints. The company's statements were not severe enough to constitute libel per se, and the tenant did not state a claim

for libel per quod because he failed to allege that he suffered a pecuniary loss.

**\*1** Appeal by plaintiff from order entered 3 September 2008 by Judge L. Todd Burke in Forsyth County Superior Court. Heard in the Court of Appeals 7 May 2009.

Mark A. Ward, pro se, plaintiff-appellant.

Hinshaw & Jacobs, LLP, by Robert D. Hinshaw, for defendant-appellee.

GEER, Judge.

Plaintiff Mark A. Ward appeals the trial court's order dismissing his defamation claim against defendant Jett Properties, LLC, and imposing Rule 11 sanctions against him. Because plaintiff's complaint fails to allege all of the essential elements of libel *per se* or libel *per quod,* we affirm the trial court's dismissal of his complaint. We also hold that the trial court's findings of fact support its conclusion that plaintiff filed his complaint for an improper purpose. The trial court, however, failed to make sufficient findings of fact explaining the basis for the particular amount of the sanction imposed, and we are, therefore, required to remand for the necessary findings of fact.

*Facts*

On 3 July 2008, plaintiff, proceeding *pro se,* filed a complaint against defendant in Forsyth County Superior Court, seeking damages for intentional infliction of emotional distress and defamation. Plaintiff lives in Unit # 21 at Buckeye Manor Townhomes, which are owned and operated by defendant. In his complaint, plaintiff alleged that he sent a letter to defendant several months prior to the filing of the complaint in which he notified defendant of a dispute with neighboring tenants. In that letter, plaintiff complained that his neighbors were

© 2010 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

Page 2

690 S.E.2d 767, 2010 WL 346459 (N.C.App.)
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 690 S.E.2d 767, 2010 WL 346459 (N.C.App.))**

parking their vehicles in unassigned spots, blocking his vehicle, and engaging in hostile conduct towards him. He asked in this letter that defendant take action to prevent these incidents in the future.

Plaintiff's complaint alleged that defendant, in response to his letter, sent him a letter threatening to evict him, to direct the homeowners' association to take over his parking space, and to have him targeted by law enforcement officers for driving a vehicle without North Carolina tags. Plaintiff's complaint further alleged that he "reasonably believed that defendant intended to carry out the threats, and as a result, plaintiff lived in constant fear that plaintiff would suffer physical harm at the hands of defendant." According to the complaint, plaintiff "suffered severe mental pain, fright, distress, shock, anxiety, and anguish as a consequence, to plaintiff's damage."

Plaintiff's complaint also alleged that the letter sent by defendant to him contained false and defamatory statements. Specifically, the complaint alleged that the following statements in defendant's letter were false and defamatory:

> "The letter you sent via Certified Mail seems an expensive way for you to complain but since this kind of thing seems to be a hobby for you let us assure you that we are taking *your continued harassment* very seriously.

> Please be advised that we have contacted our attorney once again about *your continued pestering behavior.*

> **\*2** *Your harassment* has caused several tenants to move from Buckeye and be warned that if *your continued threats* or *frivolous civil summons* cause one of our tenants to move out we will seek from you and win recovery for loss of income for as long as the townhouse remains unoccupied, attorney fees, any cost to prepare the vacated townhouse for new tenant move in, and any awards that the court may deem suitable for the harassment we have put up with.

> It is sad that *the children* of our tenants do *not feel safe* in their own yard (the Common Grounds of Buckeye Townhomes) because *they feel they are being stalked by you* and *your constant gawking,* picture taking, *threats,* etc.

> We have advised our attorney to do whatever it takes to stop *your nuisance behavior* and to take any legal action for *harassment* and any other legitimate complaint we can bring before you.

> We have also contacted the president of the Home Owners association regarding *your irritating and unwarranted complaints.*

> From our understanding he has met with you more than once regarding *the problems you have created* since you have been a Buckeye tenant.

> The Home Owners Association President also informed us that he is going to contact your landlord about *the constant trouble you seem to instigate.*

> We are pressing to have you removed from Buckeye Townhomes *for causing so many unjustified problems.*

> We look forward to seeing you in court again for the other civil summons filed against our tenants in # 11 and hope to see you even more embarrassed this time than last when the judge orders you to stop this harassment and reimburse us for the time and effort we have wasted enduring *your nonsense.*"

(Emphasis original.)

The complaint alleged that "[s]uch defamatory matter was delivered by defendant to Robert D. Hinshaw, Buckeye Townhomes Homeowners Association, and Deputy James G. Teague, to be read by those persons who understood that the communication referred to the plaintiff." The complaint further alleged that "[i]n making this communication, defendant intended it to mean that plaintiff was unworthy and was intended to deprive plaintiff of his

Case 3:10-cv-00061-RLV-DSC Document 22 Orig. Filed 06/08/10 Page 7 of 55

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

690 S.E.2d 767, 2010 WL 346459 (N.C.App.)
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 690 S.E.2d 767, 2010 WL 346459 (N.C.App.))**

good name, reputation, to bring the plaintiff into scandal, ridicule and disrepute before his friends, neighbors, acquaintances, and the public in general, and to hold plaintiff up to public scorn, contempt, ridicule and disgrace."

The complaint alleged that plaintiff's reputation was injured and that he had "suffered a tremendous amount of embarrassment, humiliation, and mental agony" and "been held in contempt, calumny, distrust, and ridicule." Finally, the complaint alleged that "[a]t the time of the willful defamatory publication, defendant knew that the words were untrue, and in making the willful defamatory publication, defendant acted with malice toward plaintiff with such recklessness and carelessness as to amount to a wanton disregard of the rights of plaintiff" and to warrant punitive damages.

**\*3** In response, defendant filed a motion to dismiss pursuant to Rule 12(b)(6), contending that plaintiff had failed to allege the essential elements of a claim for defamation or for intentional infliction of emotional distress. Defendant also filed a motion for sanctions pursuant to Rule 11, alleging that plaintiff had filed a previous lawsuit against defendant that was dismissed and resulted in plaintiff being sanctioned in the amount of $2,000.00 and that plaintiff had filed over 50 actions in the last six years, some of which were for identical complaints.

On 3 September 2008, the trial court granted defendant's motion to dismiss plaintiff's claims with prejudice. The trial court also imposed Rule 11 sanctions on plaintiff of $2,000.00 for defendant's attorneys' fees and costs. Plaintiff timely appealed to this Court.

## I

Plaintiff first contends that his complaint sufficiently stated a claim for defamation to survive defendant's motion to dismiss.[FN1] This Court reviews a trial court's ruling on a motion to dismiss de novo. *Leary v. N.C. Forest Prods., Inc.,* 157 N.C.App.

396, 400, 580 S.E.2d 1, 4, *aff'd per curiam,* 357 N.C. 567, 597 S.E.2d 673 (2003). We must, therefore, determine whether the allegations in plaintiff's complaint, if treated as true, are sufficient to state a legal claim for relief. *Id.*

> FN1. As plaintiff makes no argument in his brief about the propriety of the trial court's dismissal of his claim for intentional infliction of emotional distress, we deem that argument abandoned and do not address it. *See* N.C.R.App. P. 28(a).

"To be actionable, a defamatory statement must be false and must be communicated to a person or persons other than the person defamed ." *Andrews v. Elliot,* 109 N.C.App. 271, 274, 426 S.E.2d 430, 432 (1993). In addition, in North Carolina, our courts

> "recognize[ ] three classes of libel: (1) publications obviously defamatory which are called libel *per se;* (2) publications susceptible of two interpretations one of which is defamatory and the other not; and (3) publications not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances become libelous, which are termed libels *per quod.*"

*Craven v. SEIU Cope,* 188 N.C.App. 814, 816-17, 656 S.E.2d 729, 732 (2008) (quoting *Daniels v. Metro Magazine Holding Co.,* 179 N.C.App. 533, 538, 634 S.E.2d 586, 590 (2006), *appeal dismissed and disc. review denied,* 361 N.C. 692, 654 S.E.2d 251 (2007)).

On appeal, plaintiff argues only generally that defendant "published derogatory statements to third parties about Plaintiff[,]" that the complaint "contained allegations sufficient to show that the matter complained of was defamatory as to the Plaintiff[,]" and that "the defamatory matter was communicated to third persons who understood that it referred to the Plaintiff." (Internal citation to the record omitted.) Plaintiff's complaint purports to allege claims for libel *per se* and libel *per quod.* Plaintiff does not, however, on appeal, specifically

Page 4

690 S.E.2d 767, 2010 WL 346459 (N.C.App.)
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 690 S.E.2d 767, 2010 WL 346459 (N.C.App.))

explain in what way his complaint's allegations are sufficient to fall into one of those two categories of libel.

This Court has defined libel *per se* as

**\*4** "a publication which, when considered alone without explanatory circumstances: (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace ."

*Boyce & Isley, PLLC v. Cooper,* 153 N.C.App. 25, 29, 568 S.E.2d 893, 898 (2002) (quoting *Phillips v. Winston-Salem/Forsyth County Bd. of Educ.,* 117 N.C.App. 274, 277, 450 S.E.2d 753, 756 (1994), *disc. review denied,* 340 N.C. 115, 456 S.E.2d 318 (1995)), *appeal dismissed and disc. review denied,* 357 N.C. 163, 580 S.E.2d 361, *cert. denied,* 540 U.S. 965, 124 S.Ct. 431, 157 L.Ed.2d 310 (2003).

A court reviewing an allegedly defamatory statement must review the words "as ordinary people would understand" them. *Renwick v. News & Observer Pub. Co.,* 310 N.C. 312, 319, 312 S.E.2d 405, 410, *cert. denied,* 469 U.S. 858, 105 S.Ct. 187, 83 L.Ed.2d 121 (1984). In an action for libel or slander *per se,* " 'malice and damages are presumed from the fact of publication and no proof is required as to any resulting injury.' " *Id.* at 316, 312 S.E.2d 405, 312 S.E.2d at 408 (quoting *Flake v. Greensboro News Co.,* 212 N.C. 780, 785, 195 S.E. 55, 59 (1938)).

In his complaint, plaintiff alleges that defendant's letter subjected him to "public scorn, contempt, ridicule and disgrace" and, therefore, amounts to libel *per se.* Our appellate courts have, however, consistently set a high threshold for plaintiffs attempting to allege libel *per se.* Thus, it is well established that "alleged false statements made by defendants, calling plaintiff 'dishonest' or charging that plaintiff was untruthful and an unreliable employee, are not actionable per se." *Stutts v. Duke Power*

*Co.,* 47 N.C.App. 76, 82, 266 S.E.2d 861, 865 (1980). Likewise, an insurance company's statement that it was cancelling the plaintiff's policy because of his " 'infavorable [sic] personal habits' " was not libelous *per se. See Robinson v. Nationwide Ins. Co.,* 273 N.C. 391, 395, 159 S.E.2d 896, 899 (1968). Finally, our Supreme Court held in *Penner v. Elliott,* 225 N.C. 33, 34, 33 S.E.2d 124, 125 (1945), that no claim for libel *per se* existed for statements that the plaintiff was a man who would not pay his debts, would not work, and was "a man that respectable people had best not have anything to do with."

In this case, plaintiff has identified as libelous defendant's statements that plaintiff was causing problems in his community with other tenants and was harassing or pestering defendant with his frivolous complaints. We do not believe that such statements are more severe than accusations of dishonesty or unfavorable personal habits or characterizations of a person as a dead-beat or disreputable, such as those statements previously found by our appellate courts not to amount to libel *per se. See also Perry v. Wiltse,* 256 Ill.App.3d 422, 424, 195 Ill.Dec. 162, 628 N.E.2d 626, 628 (Ill.App. 1 Dist., 1993) (holding that statement made by building manager to tenant's landlord that tenant had called and harassed her every night with complaints was not libelous *per se,* because manager used word harass "not to suggest the commission of a criminal offense but rather in the sense of to bother or irritate").

**\*5** Further, this Court has stressed that "[r]hetorical hyperbole and expressions of opinion not asserting provable facts are protected speech." *Daniels,* 179 N.C.App. at 539, 634 S.E.2d at 590. Thus, for example, a statement that an insurance adjuster spoke in a "sinister" or "Gestapo" voice was not actionable because it represented the speaker's opinion. *Id.* at 540, 634 S.E.2d at 591. In *Greenbelt Coop. Pub. Ass'n v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6, 15 (1970), the United States Supreme Court concluded that a characteriz-

Page 5

690 S.E.2d 767, 2010 WL 346459 (N.C.App.)
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 690 S.E.2d 767, 2010 WL 346459 (N.C.App.))**

ation of a real estate developer's negotiation position as "blackmail" was "no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable."

In determining whether a statement can be reasonably interpreted as stating actual facts about an individual or whether it constitutes opinion or rhetorical hyperbole, "courts look to the circumstances in which the statement is made." *Daniels,* 179 N.C.App. at 539, 634 S.E.2d at 590 (citing *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 21, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1, 19 (1990)). The Court explained in *Daniels* that "[s]pecifically, we consider whether the language used is 'loose, figurative, or hyperbolic language,' as well as the 'general tenor of the article.' " *Id.* at 540, 634 S.E.2d at 590 (quoting *Milkovich,* 497 U.S. at 21, 110 S.Ct. at 2707, 111 L.Ed.2d at 19).

In this case, defendant's letter was sent in response to a demand letter by plaintiff, accusing defendant of misconduct. In this context and after reading the entire document, defendant's characterization of plaintiff's conduct as harassment, pestering, threatening, irritating, and nonsense amounts to statements of opinion or rhetorical hyperbole that are not actionable as libel *per se.*

Turning to plaintiff's libel *per quod* claim, our courts have defined such a claim as involving " 'publications not obviously defamatory but [that] when considered with innuendo, colloquium, and explanatory circumstances become libelous....' " *Craven,* 188 N.C.App. at 816-17, 656 S.E.2d at 732 (quoting *Daniels,* 179 N.C.App. at 538, 634 S.E.2d at 590). In *Holleman v. Aiken,* 193 N.C.App. 484, 499-500, 668 S.E.2d 579, 589 (2008) (quoting *Raymond U v. Duke Univ.,* 91 N.C.App. 171, 181, 371 S.E.2d 701, 708, *disc. review denied,* 323 N.C. 629, 374 S.E.2d 590 (1988)), this Court explained that

> "[u]nder a libel *per quod* theory, there must be a publication or communication knowingly made by the defendant to a third person. The publica-

tion must have been intended by defendant to be defamatory and had to be understood as such by those to whom it was published. For these reasons, both the innuendo and special damages must be proven."

In *Donovan v. Fiumara,* 114 N.C.App. 524, 527, 442 S.E.2d 572, 575 (1994) (quoting *Williams v. Freight Lines,* 10 N.C.App. 384, 387, 179 S.E.2d 319, 322 (1971)), we explained that "[i]n the context of an action for defamation, special damage means 'pecuniary loss[.]' " If plaintiff fails to allege that the alleged libel caused him pecuniary damage, he or she has failed to state a claim for libel *per quod. Id.* Here, plaintiff's complaint contains no allegation of pecuniary loss. Accordingly, his complaint does not state a claim for libel *per quod,* and the trial court properly granted defendant's motion to dismiss plaintiff's defamation claim.

## II

**\*6** Plaintiff also argues that the trial court erred in imposing Rule 11 sanctions on him. This Court reviews de novo a trial court's order granting a motion for Rule 11 sanctions. Our task is to determine

> (1) whether the trial court's conclusions of law support its judgment or determination, (2) whether the trial court's conclusions of law are supported by its findings of fact, and (3) whether the findings of fact are supported by a sufficiency of the evidence. If the appellate court makes these three determinations in the affirmative, it must uphold the trial court's decision to impose or deny the imposition of mandatory sanctions under N.C.G.S. § 1A-1, Rule 11(a).

*Turner v. Duke Univ.,* 325 N.C. 152, 165, 381 S.E.2d 706, 714 (1989). "The appropriateness of the sanction imposed, however, is reviewed under an abuse of discretion standard." *Ward v. Jett Props., LLC,* 191 N.C.App. 605, 607, 663 S.E.2d 862, 864 (2008).

Rule 11(a) of the Rules of Civil Procedure provides

Page 6

690 S.E.2d 767, 2010 WL 346459 (N.C.App.)
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 690 S.E.2d 767, 2010 WL 346459 (N.C.App.))**

that

> [a] party who is not represented by an attorney shall sign his pleading, motion, or other paper and state his address.... The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Thus, " '[t]here are three parts to a Rule 11 analysis: (1) factual sufficiency, (2) legal sufficiency, and (3) improper purpose.... A violation of any one of these requirements mandates the imposition of sanctions under Rule 11.' " *Static Control Components, Inc. v. Vogler,* 152 N.C.App. 599, 603, 568 S.E.2d 305, 308 (2002) (quoting *Dodd v. Steele,* 114 N.C.App. 632, 635, 442 S.E.2d 363, 365, *disc. review denied,* 337 N.C. 691, 448 S.E.2d 521 (1994)).

Here, the trial court found:

> [I]t appearing to the Court that the complaint of Plaintiff is the fourth complaint filed against Defendant in the past year, all of which have been dismissed and reviewed by the Court of Appeals without success; that the Plaintiff has filed more than 50 actions in this county in the last 5 years; that the Plaintiff has been sanctioned under Rule 11 for his previous cases against the Defendant; that the instant case was filed without due regard for the prevailing law and that the instant case was filed for an improper purpose, namely to continue his harassment of the Defendant:
>
> THEREFORE THE COURT finds that the instant lawsuit was filed knowing that the claims were not warranted by existing law and further

were filed for an improper purpose, that is harassment of the Defendant.

Thus, the trial court awarded sanctions because it found that plaintiff's complaint was filed without legal sufficiency and/or for an improper purpose. The trial court then imposed on plaintiff sanctions in the amount of $2,000.00 to reimburse defendant for attorneys' fees and costs.

**\*7** We need not decide whether the trial court erred in awarding sanctions based on the ground that the complaint was legally insufficient because we agree with the trial court that the unchallenged findings of fact it made in support of its conclusion of improper purpose support the award of sanctions. *See Dodd,* 114 N.C.App. at 635, 442 S.E.2d at 365 (holding that because it had already found a violation of one prong of Rule 11, it was "unnecessary to address the others"). "The improper purpose prong of Rule 11 is separate and distinct from the factual and legal sufficiency requirements." *Bryson v. Sullivan,* 330 N.C. 644, 663, 412 S.E.2d 327, 337 (1992). Thus, "[e]ven if the complaint is well grounded in fact and in law, it may nonetheless violate the improper purpose prong of Rule 11." *McClerin v. R-M Indus., Inc.,* 118 N.C.App. 640, 644, 456 S.E.2d 352, 355 (1995).

"Under Rule 11, an objective standard is used to determine whether a paper has been interposed for an improper purpose, with the burden on the movant to prove such improper purpose. In this regard, the relevant inquiry is whether the existence of an improper purpose may be inferred from the alleged offender's objective behavior." *Mack v. Moore,* 107 N.C.App. 87, 93, 418 S.E.2d 685, 689 (1992) (internal citation omitted). An "improper purpose is any purpose other than one to vindicate rights ... or to put claims of right to a proper test." *Id.* (internal quotation marks omitted).

In this case, the trial court found that plaintiff had filed and had dismissed at least four complaints against defendant in the last year and that all of those dismissals had been upheld on appeal. The

690 S.E.2d 767, 2010 WL 346459 (N.C.App.)
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 690 S.E.2d 767, 2010 WL 346459 (N.C.App.))**

trial court also found that plaintiff filed over 50 actions in Forsyth County in the last five years and that plaintiff had been sanctioned in his previous cases against defendant. These findings, unchallenged by plaintiff on appeal, are sufficient to support the trial court's conclusion that plaintiff's complaint was filed for an improper purpose. *See Ward,* 191 N.C.App. at 609, 663 S.E.2d at 865 ("Improper purpose may, however, be inferred from the service or filing of excessive, successive, or repetitive papers or from continuing to press an obviously meritless claim after being specifically advised of its meritlessness by a judge or magistrate." (internal citation and quotation marks omitted)).

Although we uphold the trial court's conclusion that plaintiff filed his complaint for an improper purpose, we must nonetheless remand this case because the trial court failed to make sufficient findings of fact and conclusions of law to explain and support its particular sanction of $2,000.00 in attorneys' fees and costs. In fact, the trial court did not make any findings of fact at all relating to the amount of the sanction. Instead, the sole reference in the order to the sanction is: "IT IS THEREFORE ORDERED that the Defendant's Motion is Granted and the Defendant is awarded the sum of Two Thousand Dollars ($2,000.00) for attorney fees and costs of this action from the Plaintiff."

**\*8** In *Dunn v. Canoy,* 180 N.C.App. 30, 49, 636 S.E.2d 243, 255 (2006), *appeal dismissed and disc. review denied,* 361 N.C. 351, 645 S.E.2d 766 (2007), this Court remanded an order awarding sanctions when the trial court's order did not explain how the trial court calculated the amount it selected for the award or why the trial court thought that was the appropriate sanction. This Court explained:

> A trial court, in making an award of attorneys' fees, must explain why the particular award is appropriate and how the court arrived at the particular amount. Specifically, an award of attorney's fees usually requires that the trial court enter findings of fact as to the time and labor expen-

ded, skill required, customary fee for like work, and experience or ability of the attorney based on competent evidence.

*Id.* (internal citation and quotation marks omitted).

Here, the trial court stated that it was awarding $2,000.00 in attorneys' fees and costs, but made no findings regarding time and labor expended, skill required, customary fees for like work, or the experience and ability of the attorney. Nor does the order include any other explanation for the sanction amount. Since no findings of fact exist to support the amount of the trial court's sanction, we must remand for further findings of fact. *See Sholar Bus. Assocs. v. Davis,* 138 N.C.App. 298, 303, 531 S.E.2d 236, 240 (2000) ("As a general rule, remand is necessary where a trial court fails to enter findings of fact and conclusions of law regarding a motion for sanctions pursuant to Rule 11.").

Affirmed in part; reversed and remanded in part.

Judges BRYANT and STEPHENS concur.
Report per Rule 30(e).

N.C.App.,2010.
Ward v. Jett Properties, LLC
690 S.E.2d 767, 2010 WL 346459 (N.C.App.)

END OF DOCUMENT


Slip Copy, 2010 WL 143094 (W.D.N.C.)
**(Cite as: 2010 WL 143094 (W.D.N.C.))**

**C**

Only the Westlaw citation is currently available.

United States District Court, W.D. North Carolina,
Charlotte Division.
DIAGNOSTIC DEVICES, INC., Plaintiff,
v.
DOCTOR DIABETIC SUPPLY, INC., Defendant.
**Civil No. 3:09CV135-GCM.**

Jan. 11, 2010.

Ashley Long Ellis, Morgan Hunter Rogers, Parker Poe, Parker Poe Adams & Bernstein, Charlotte, NC, for Plaintiff.

Keith Thomas Grumer, Grumer & Macaluso, P.A., Fort Lauderdale, FL, Kenneth R. Raynor, Templeton & Raynor, P.A., Charlotte, NC, for Defendant.

*ORDER*

GRAHAM C. MULLEN, District Judge.

**\*1 THIS MATTER** is before the Court upon the Defendant's Motion to dismiss Plaintiff's Second Amended Complaint, filed July 13, 2009; Plaintiff's Brief in opposition to Defendant's Motion to Dismiss, filed July 29, 2009; and Defendant's Reply in support of Defendant's Motion to Dismiss, filed August 10, 2009. For the reasons set forth below, Defendant's motion is GRANTED as to Plaintiff's claim for relief for libel per se, but DENIED as to all of Plaintiff's other claims.

*I. BACKGROUND*

Plaintiff is in the business of selling diabetic supplies, including diabetic testing meters and strips, under the brand name "Prodigy" to distributors, who then sell the products to end users. Defendant is a distributor of diabetic supplies, to whom the

Plaintiff claims to have sold over a million dollars worth of supplies between 2007 and 2009. This case stems from a shipment of diabetic supplies from the Plaintiff to the Defendant on January 8, 2009, which Plaintiff claims Defendant accepted and then refused to pay for pursuant to the terms of a contract between the parties. The Plaintiff alleges damages in the amount of $100,603.25 resulting from Defendant's refusal to pay. In the alternative to its claim for breach of contract, the Plaintiff asserts a claim in quantum meruit, for those supplies delivered and accepted by the Defendant.

In addition, Plaintiff asserts causes of action for defamation, libel per se, unfair and deceptive trade practices under North Carolina statues, and unfair competition under North Carolina common law, based on allegations by the Plaintiff that the Defendant made misrepresentations to its customers regarding the availability of Plaintiff's product. Specifically, Plaintiff claims that Defendant made misrepresentations to its customers in letters dated March 26, 2009 and March 28, 2009, and through website content and telephone contact with customers, in which Defendant informed them that it would no longer carry Plaintiff's "Prodigy" diabetic supplies because the "manufacturer is discontinuing this model within the U.S. markets." (Exhibits D & E to Second Amended Complaint) Plaintiff alleges Defendant knew this to be incorrect because Plaintiff had previously sent the Defendant a letter on February 5, 2009, informing the Defendant that the Plaintiff's product was not in short supply and that "it will continue to be manufactured by DDI." (Exhibit G to Second Amended Complaint)

*II. DISCUSSION*

**A. Standard of Review**

"A motion to dismiss under [Fed.R.Civ.P. 12(b)(6)] tests the sufficiency of a complaint; importantly, it

does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of North Carolina v. Martin,* 980 F.2d 943, 952 (4th Cir.1993) *citing* 5A C. Wright & A. Miller, Fed. Practice and Procedure § 1356 (1990). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 550 (2007)) The facial plausibility standard requires "the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief." *Francis v. Giacomelli,* No. 08-1908 (4th Cir. Dec. 2, 2009) (quoting *Iqbal, 129 S.Ct. at 1950).* "The Supreme Court has held that a complaint must contain 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " *Id.* at 9 (*quoting* Iqbal, 129 S.Ct. at 1949).

### B. Claims for Breach of Contract and Quantum Meruit

**\*2** The elements of a breach of contract claim under North Carolina law are: (1) the existence of a valid contract between the parties; (2) breach of that contract; and (3) damages resulting from the breach. *Lee Cycle Center, Inc. v. Wilson Cycle Center, Inc.,* 545 S.E.2d 745, 751 (N.C.App.2001). The Plaintiff has a valid claim for breach of contract because it has properly alleged facts, including a history of business transactions, and written records, between the parties that, taken as true, suggest the possible existence of a valid contract between the parties. Plaintiff also fulfills the pleading requirements of the second and third elements by claiming that the Defendant has refused to fully pay for goods properly delivered by the Plaintiff, therefore damaging Plaintiff to the extent of the unpaid balance. Based on these same facts, Plaintiff has properly alleged a claim for quantum meruit. Under North Carolina law, while a party may not recover under both a theory of breach of contract and quantum meruit, a

party may plead quantum meruit in the alternative. *James River Equip., Inc. v. Mecklenburg Utilities, Inc.,* 634 S.E.2d 557, 560 (N.C.App.2006).

### C. Claims for Defamation and Libel Per Se

To state a claim for defamation the Plaintiff must allege that: (1) the defendant caused injury to the plaintiff, (2) by making false, defamatory statements, (3) the statements were of, or concerning, the plaintiff, and (4) the statements were published to a third person. *Boyce & Isley, PLLC v. Cooper,* 568 S.E.2d 893, 897 (N.C.App.2002). Here, the Plaintiff has alleged in its complaint that it was harmed by statements made by the Defendant to its customers containing misrepresentations regarding the Plaintiff's product and business, the issue is whether the statements, viewed in a light most favorable to the Plaintiff, rise to the level of being "defamatory." North Carolina law recognizes two types of defamation torts, libel and slander. There are three categories of libel:

> (1) Publications which are obviously defamatory and which are termed libels per se; (2) publications which are susceptible of two reasonable interpretations, one of which is defamatory and the other is not; and (3) publications which are not obviously defamatory, but which become so when considered in connection with innuendo, colloquium and explanatory circumstances. This type of libel is termed libel per quod. *Ellis v. Northern Star Co.,* 326 N.C. 219, 223, 388 S.E.2d 127,130 (1990).

A publication is libel per se if, among other things, it "tends to impeach one in his trade or profession." *Id.* at 224. " '[F]alse words imputing to a merchant or business man conduct derogatory to his character and standing as a business man tending to prejudice him in his business are actionable, and words so uttered may be actionable per se.' The false words (1) must touch the plaintiff in his special trade or occupation, and (2) must contain an imputation necessarily hurtful in its effect on his business." *Clark*

*v. Brown,* 393 S.E.2d 134 (N.C.App.1990) (quoting *Badame v. Lampke* 89 S.E.2d 466,468 (1955). Plaintiff bases its claims for libel per se on two letters sent by the Defendant to two of its customers, in which it falsely suggests that Plaintiff's product is in short supply and the manufacturer is discontinuing it in the U.S. Market. (Exhibits D & E to Second Amended Complaint). In a business context, a statement that does not "assert any illegal or wrongful activity" by the plaintiff, generally does not rise to the level of defamation recognized under North Carolina law. *Nucor Corp. v. Prudential Equity Group, LLC,* 659 S.E.2d 483 (N.C.App.2008). Here, the Defendant has made false statements regarding the availability of the Plaintiff's product, but has not impeached the Plaintiff's business reputation for legality or integrity. Therefore, even viewed in the light most favorable to the Plaintiff, these statements do not rise to the level of libel per se.

**\*3** In the alternative, Plaintiff asserts a claim for defamation, in the forms of libel per quod and slander per quod, based on the letters, website content, and oral statements Plaintiff believes have been made by the Defendant to its customers. Under the per quod theory, "the publication must have been intended by the defendant to be defamatory and had to be understood as such by those to whom it was published ... [f]or these reasons, both the innuendo and special damages must be proven." *Holleman v. Aiken,* 668 S.E.2d 579, 588 (N.C.App.2008) (quoting *Raymond U v. Duke University,* 371 S.E.2d 701, 708 (N.C.App.1988). In other words, "if the injurious nature of the spoken statement appears, not on its face as a matter of general acceptance, but only in consequence of extrinsic, explanatory facts showing its injurious effect ... the injurious character of the words must be plead and proved, and in order to recover there must be allegation and proof of some special damage." *Badame* at 467.

The Plaintiff alleges in its complaint that Defendant's statements are injurious when considered in conjunction with other defamatory statements about the Plaintiff and its products made by competitors and a former manufacturer. Specifically, the Plaintiff cites an allegedly defamatory letter from the former manufacturer of its Prodigy brand products, which asserts that the Plaintiff "sells fake test strips to its customers." (Complaint, ¶ 67). Plaintiff also claims that it has special damages because the Defendant's statements caused its customers to no longer order and purchase Plaintiff's testing meters or strips, therefore damaging Plaintiff to the extent of its former average monthly sales to the Defendant in the amount of $98,743.32. These factual claims sufficiently fulfill Plaintiff's obligation under the special pleading requirements for defamation per quod because, taken as true, Plaintiff has alleged extrinsic circumstances that could suggest a plausible reason for a defamatory understanding by those customers that received the Defendant's statements, and specific damages that resulted from that harm.

**D. Claims for Unfair and Deceptive Trade Practices under Chapter 75 of the North Carolina**

General Statues and for Unfair Competition under North Carolina Common Law "To recover under the UTPA, a plaintiff must prove (1) that the defendant engaged in conduct that was in or affecting commerce, (2) that the conduct was unfair or 'had the capacity or tendency to deceive', and (3) 'that the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation.' " *Gilbane Bldg. Co. v. Federal Reserve Bank of Richmond, Charlotte Branch,* 80 F.3d 895, 902 (4th Cir.1996)(quoting *Pearce v. American Defender Life Ins. Co.,* 316 N.C. 461, 343 S.E.2d 174 (1986). "Acts are deceptive when they possess the tendency or capacity to mislead, or create the likelihood of deception." *Id.* at 903 (quoting *Chastain v. Wall,* N.C.App. 350, 337 S.E.2d 150,154 (1985), disc. rev. denied, 316 N.C. 375, 342 S.E.2d 891(1986). Here, the Plaintiff successfully pleads a cause of action under the UTPA by claiming that the Defendant knowingly made mis-

representations to its customers regarding Plaintiff's product and business, which caused the Plaintiff to lose sales and goodwill. While the Defendant asserts that only business competitors can sustain a claim under the UTPA, under North Carolina law, "one business is permitted to assert an UTPA claim against another business only when the businesses are competitors (or potential competitors) *or are engaged in commercial dealings with each other.*" *Food Lion, Inc. v. Capital Cities/ABC, Inc.,* 194 F.3d 505, 521 (4th Cir.1999) (emphasis added). In the instant case, the Plaintiff alleges that the parties were engaged in buying and selling diabetic supplies, and therefore involved in commercial dealings with each other.

**\*4** Plaintiff's claim for unfair competition is based on the same misrepresentations. The North Carolina Supreme Court has pointed out that "it is often very difficult to draw a distinction between fair and unfair competition." *Carolina Aniline & Extract Co. v. Ray,* 20 S.E.2d 59, 61 (1942). However, "the test is simple ... Has the plaintiff's legitimate business been damaged through acts of the defendants which a court in equity would consider unfair?" *Id.* at 61. Here, the Plaintiff has alleged that the Defendant made knowing misrepresentations that Plaintiff's product was in short supply because the manufacturer was discontinuing it in the U.S. market. This allegation, that Defendant deliberately misled customers as to the availability of the Plaintiff's product, is plausible enough to sustain a claim for unfair competition, and is sufficient to meet Plaintiff's burden to avoid dismissal.

### III. CONCLUSION

IT IS THEREFORE ORDERED that Defendant's motion is GRANTED as to Plaintiff's claim for libel per se, and this claim is hereby DISMISSED with prejudice. As to all other claims, this motion is DENIED.

W.D.N.C.,2010.
Diagnostic Devices, Inc. v. Doctor Diabetic Supply,

Inc.
Slip Copy, 2010 WL 143094 (W.D.N.C.)

END OF DOCUMENT



Slip Copy, 2010 WL 431692 (W.D.N.C.)
**(Cite as: 2010 WL 431692 (W.D.N.C.))**

Only the Westlaw citation is currently available.

United States District Court, W.D. North Carolina,
Charlotte Division.
Robin L. CURRY, Plaintiff,
v.
PHILIP MORRIS USA, INC., Defendant.
**No. 3:08cv609.**

Feb. 4, 2010.

Robin L. Curry, Charlotte, NC, pro se.

Eric Michael David Zion, Hunton & Williams LLP, Charlotte, NC, for Defendant.

***ORDER***

ROBERT J. CONRAD, JR., Chief Judge.

**\*1 THIS MATTER IS BEFORE THE COURT** on Defendant's motion to dismiss and its supporting memorandum of law (Doc. Nos. 7 & 8) filed by Defendant Philip Morris USA, Inc.; Plaintiff's Response (Doc. No. 10); and Defendant's Reply and Notice of Subsequently Decided Authority (Doc. Nos. 12 & 13). For the reasons stated below, Defendant's motion to dismiss (Doc. No. 7) will be **GRANTED.**

**I. BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff's Amended Complaint (Doc. No. 4) makes the following allegations the Court finds relevant to her subsequent claims for relief: Plaintiff, an African-American woman, began her employment with Defendant in 1986, at its Carbarrus Facility in Concord, North Carolina. She was promoted twice: first in 1991 to the position of "Material Specialist," and then in 1994 to the position of "Front Line Leader." In this position, Plaintiff "supervise[d] hourly per-

sonnel and manage[d] the process flow of tobacco."

Plaintiff performed her duties in this position as a "conscientious employee who took pride in performing her job with the highest level of professionalism" until February 5, 2007, when she attended a meeting at the request of Shelby Belk, her supervisor, and Paul Coakly, Director of Human Resources at the Carbarrus Facility. The purpose of the meeting was to discuss a "floater day" of vacation leave she had approved for Danny Billings, one of Plaintiff's subordinates. Billings had missed work on January 23, but did not submit to Plaintiff a form requesting a floater day until after his absence. Plaintiff signed the form and back-dated it to read January 19, so that Billings would avoid disciplinary action for missing work without first requesting leave. Plaintiff admitted that she approved the floater request knowing that it was back-dated and, in violation of protocol, and failed to review Billings's attendance record before granting him a floater day. Plaintiff admitted to her supervisors that her failure to review Billings's attendance record violated company policy. Plaintiff explained to Belk and Coakley, however, that back-dating the form was proper because it accurately reflected the day Billings had made a verbal request to another supervisor, and Defendant generally condoned back-dating in those circumstances. Subsequently, Belk suspended Plaintiff pending a full investigation.

On February 9, 2007, Coakley contacted Plaintiff and asked her to return to the Carbarrus Facility. Upon her arrival, a security guard instructed Plaintiff to drive to a side parking lot. There, security personnel searched Plaintiff's car while she and a co-worker observed. At the conclusion of the search, Belk informed Plaintiff that the investigation was complete and she had been terminated for falsifying company documents. Plaintiff was told she would receive a written notice of her termination but never received one.

Plaintiff filed a formal charge with the EEOC on June 15, 2007, alleging discrimination based on race and gender. She received a "right-to-sue notice" from the EEOC on September 29, 2008. Proceeding *pro se,* Plaintiff filed a Complaint (Doc. No. 1) in federal court on December 29, 2008. Plaintiff thereafter filed an Amended Complaint (Doc. No. 4) claiming the following as causes of action: (1) race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.;* (2) defamation; and (3) invasion of privacy. (*Id.* ¶ 23 & 26).[FN1] Plaintiff's Amended Complaint seeks various forms of relief, including her reinstatement with back pay, compensatory and punitive damages, and attorney's fees. (*Id.* at 12).

> FN1. Counts One, Two, Three, and Six of Plaintiff's Amended Complaint are the following fact allegations that Plaintiff characterizes as cognizable claims for relief: (1) Plaintiff did not falsify company documents; (2) Defendant neglected to provide adequate training; (3) Defendant breached its promise to send Plaintiff a letter stating her reason for dismissal; and (4) Defendant conducted a faulty and improper investigation. (Doc. No. 4: Am. Compl. ¶¶ 20-22, 24). These are not claims for relief under federal or state law; at most, they attempt to provide factual support for the claims Plaintiff has already alleged for discrimination, defamation, and invasion of privacy. Accordingly, these counts will be dismissed without further discussion.

*2 On March 3, 2009, Defendant filed the instant motion and supporting memorandum (Doc. Nos. 7 & 8) to dismiss Plaintiff's Amended Complaint under Federal Rule of Civil Procedure ("Rule") 12(b)(6). Therein, Defendant moves to dismiss Plaintiff's Title VII claims on the ground that her allegations fail to state a plausible claim for relief. (Doc. No. 8 at 3-4).[FN2] Defendant also moves to dismiss Plaintiff's state law claims on the following

grounds: (1) that Plaintiff's claim for defamation is barred by North Carolina's one-year statute of limitations; and (2) that Plaintiff's claim for invasion of privacy fails, as a matter of law, to allege an intrusion into her privacy that a reasonable person would consider highly offensive. (*Id.* at 6-8).[FN3] Plaintiff responded (Doc. No. 10), alleging new facts in support of her Title VII claims. (*Id.* at 2-3). Defendant then replied (Doc. No. 12), withdrawing in part its motion to dismiss Plaintiff's Title VII claims due to the new facts alleged in her response brief. (*Id.* at 1). Then, on June 26, 2009, Defendant filed a notice with the Court (Doc. No. 13) asserting that the recently-decided precedent governing dismissal under Rule 12(b)(6) set forth in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), warrants dismissal of Plaintiff's Amended Complaint in its entirety. (*Id.* at 2).[FN4] Thus, Defendant's motion to dismiss has been fully briefed and is now ripe for review.

> FN2. Defendant also argues for dismissal based on Plaintiff's failure to plead a prima facie case of disparate treatment under the burden-shifting framework for disparate treatment claims under Title VII established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). (Doc. No. 8 at 4-5). It appears that Defendant has since abandoned this argument, as its subsequent pleadings (Doc. Nos. 12 and 13) focus only on whether Plaintiff's claim is plausible. To the extent, however, that Defendant has not abandoned this argument, the Court finds it unpersuasive. Although Plaintiff must plead facts establishing the elements of a claim under Title VII, *Bass v. E.I. DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir .2003), she need not commit to a particular burden-shifting framework when filing her complaint. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511-12 (2002).

> FN3. Within its motion to dismiss, Defendant also moves for an award of attorney's

fees. (Doc. No. 7 at 1). This should have been filed as a separate motion. *See* Local Civil Rule 7.1(C)(2). Because Defendant has improperly moved for attorney's fees, and fails to cite any Rule or statute under which they would be authorized, the Court will not consider awarding attorney's fees in conjunction with deciding the instant motion to dismiss.

FN4. Absent any indication that Plaintiff has initiated discovery in reliance on Defendant's reply brief and is therefore prejudiced, the Court accepts Defendant's notice of subsequent authority as a renewed motion to dismiss Plaintiff's Title VII claims under Rule 12(b)(6).

## II. STANDARD OF REVIEW

To withstand a motion to dismiss under Rule 12(b)(6), the facts alleged in a complaint "must be enough to raise a right to relief above the speculative level" and must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). The United States Supreme Court recently emphasized that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1954. The Court "should view the complaint in the light most favorable to the Plaintiff," *Mylan Labs., Inc. v. Matkar,* 7 F.3d 1130, 1134 (4th Cir.1993), and accept as true all well-pleaded factual allegations in the complaint, *Swierkiewicz,* 534 U.S. at 508, n. 1. The Court need not, however, "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir.2008).

A motion to dismiss pursuant to Rule 12(b)(6) tests the "legal sufficiency of the complaint" but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952

(4th Cir.1992), *cert. denied,* 510 U.S. 828 (1993) (citing 5A C. Wright & A. Miller, Federal Practice and Procedure § 1356 (1990)). Because Plaintiff is proceeding *pro se,* the Court construes her pleadings liberally. *Boag v. MacDougall,* 454 U.S. 364, 365 (1982); *Gordon v. Leeke,* 574 F.2d 1147, 1151 (4th Cir.1978). Nevertheless, to survive dismissal, a *pro se* plaintiff must still "plead factual matter that permits the court to infer more than the mere possibility of misconduct." *Dolgaleva v. Va. Beach City Pub. Sch.,* No. 08-1515, 2010 WL 325957, at *6 (4th Cir. Jan. 29, 2010) (unpublished) (internal quotations omitted).

## III. DISCUSSION

### A. Plaintiff's Title VII Claims

**\*3** Plaintiff's Title VII claims are premised on an allegation that the disciplinary action taken against her by Defendant amounted to disparate treatment because of her race and gender. (Doc. No. 4: Am. Compl. ¶¶ 21 & 26). Title VII makes it "an unlawful employment practice for an employer ... to discharge ... any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The ultimate question in every disparate treatment case is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 135 (2000). Plaintiff's Amended Complaint offers little more than conclusory allegations to support an inference that her termination was the result of intentional discrimination based on her race or gender:

It is believed Defendant had advance knowledge that an established practice of discrepancies existed throughout the department in regards to filling out a floater day vacation form. However[,] focus was placed on Plaintiff's actions [resulting in] disparate treatment and discipline. It should be duly noted that no discipline was taken against similarly situated employees in

Slip Copy, 2010 WL 431692 (W.D.N.C.)
**(Cite as: 2010 WL 431692 (W.D.N.C.))**

an unprotected class.

(*Id.* ¶ 21). Additionally, Plaintiff alleges that De-wayne White, a white male, replaced her as the new Front Line Leader at the Carbarrus Facility after her termination. (*Id.*).

Although Plaintiff concludes that her termination resulted in "disparate treatment," she fails to allege specific facts explaining how disparate treatment actually occurred. Plaintiff does not identify the "similarly situated employees" outside of her pro-tected class, nor does she describe the alleged mis-conduct for which these individuals received no disciplinary action. Thus, these allegations are ex-actly the kind of "[t]hreadbare recitals of the ele-ments of a cause of action, supported by mere con-clusory statements" that are not entitled to a pre-sumption of truth when testing the sufficiency of Plaintiff's Amended Complaint. *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 555).

Plaintiff does, however, attempt to set forth addi-tional facts supporting her Title VII claims in her response (Doc. No. 10) to Defendant's motion to dismiss. Therein, Plaintiff alleges that no written policy existed governing the procedure by which employees in her position were to review and ap-prove requests for floating vacation days. (*Id.* at 2). In lieu of a written policy, Plaintiff specifically identifies several "unwritten procedures" governing the approval of floating vacation day requests that she and other employees recognized as "standard practice." (*Id.*). As a result, Plaintiff alleges that back-dating Billings's request was a standard prac-tice that Defendant often condoned. (*Id.*). Addition-ally, Plaintiff alleges that a subordinate employee witnessed Dewayne White, Plaintiff's replacement at the Front Line Leader position, "willingly falsify company documentation." (*Id* . at 2-3). The em-ployee reported White's misconduct to Belk, but no disciplinary action resulted, and the employee was told to "never say anything about the situation again." (*Id.* at 3). Unlike the wholly conclusory al-legations contained in Plaintiff's Amended Com-plaint, these additional allegations are sufficiently

plead such that they are accepted as true against Defendant's motion to dismiss. *Swierkiewicz,* 534 U.S. at 508 n. 1; *Mylan Labs.,* 7 F.3d at 1134.

**\*4** But even assuming their truth, these new allega-tions are insufficient to "nudge" Plaintiff's Title VII claims "across the line from conceivable to plaus-ible." *Iqbal,* 129 S.Ct. at 1951 (quoting *Twombly,* 550 U.S. at 570). At most, Plaintiff's additional al-legations establish that Defendant's policies were sometimes arbitrarily enforced, and on one occa-sion a similarly-situated employee outside of Plaintiff's protected class *may* have received more lenient treatment for comparable misconduct.[FN5] Although not inconsistent with a theory of discrim-ination, these additional allegations fall short of plausibly suggesting that Plaintiff's race or gender was indeed a motivating factor behind the decision to terminate her employment. *See Twombly,* 550 U.S. at 545 (requiring allegations "plausibly sug-gesting," not "merely consistent with," a cause of action); *see also Reeves,* 530 U.S. at 135 (intentional discrimination is the "ultimate ques-tion" in any disparate treatment case). By Plaintiff's own admission, she violated clear and unambiguous company policy by failing to check Danny Billings's attendance history before granting him an additional floating vacation day. (Doc. No. 4: Am. Compl. ¶ 14). Common sense dictates that in light of this fact, the Court can draw no more than the "mere possibility" of discrimination from the other facts alleged in Plaintiff's Amended Complaint and response to Defendant's motion to dismiss. *Iqbal,* 129 S.Ct. at 1950; *Twombly,* 550 U.S. at 557. Thus, Plaintiff has failed to plausibly show that she is en-titled to relief under Title VII, and her claims for gender and race discrimination will be dismissed.

> FN5. Plaintiff's allegation that Dewayne White, a white male, received no disciplin-ary action for "willingly falsify[ing] com-pany documentation" is sufficiently vague so that the Court is unable to determine whether it alleges misconduct that is more or less severe than that which resulted in

Plaintiff's termination.

## B. Plaintiff's State Law Claims

Plaintiff makes a general allegation that her termination process resulted in defamation of character and invasion of privacy. (Doc. No. 4: Am. Compl. ¶ 23). Both of these state law claims are based on the search of Plaintiff's automobile performed by Defendant's security personnel on February 9, 2007. (*Id.*). Plaintiff alleges that this search was performed without her permission and in front of one of her co-workers. (*Id.*). She further alleges that security personnel searched the car itself, as well as her personal belongings in the car, including her purse. (*Id.*). Plaintiff alleges that this search conveyed the "negative message" to onlookers that Plaintiff was "dishonest and not to be trusted." (*Id.*).

### 1. *Defamation*

Under North Carolina law, "[i]n order to recover for defamation, a plaintiff must allege that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Boyce & Isley, PLLC v. Cooper,* 568 S.E.2d 893, 897 (N.C.App.2002). "The term defamation includes two distinct torts, libel and slander. In general, libel is written while slander is oral." *Iadanza v. Harper,* 611 S.E.2d 217, 222 (N.C.App.2005) (quoting *Tallent v. Blake,* 291 S.E.2d 336, 338 (N.C.App.1982)). Claims for defamation must be brought within one year after publication of the allegedly defamatory statement. N.C. Gen.Stat. § 1-54(3) (concerning libel and slander); *Gibson v. Mut. Life Ins. Co. of N.Y.,* 465 S.E.2d 56, 58 (N.C.App.1996) ("The statute of limitation for defamation is one year under N.C.Gen.Stat. § 1-54 (3)....").

**\*5** Plaintiff fails to identify an allegedly defamatory statement published by Defendant. To the extent that Plaintiff alleges that the search itself was defamatory, non-verbal conduct is generally immune

from claims of defamation. *See Shillington v. K-Mart Corp.,* 402 S.E.2d 155, 159 (N.C.App.1991) ( "Slander, generally, is the *speaking* of base or defamatory words which tend to prejudice another in his reputation, office, trade, business or means of livelihood.") (emphasis added). Having failed to plead this essential element, Plaintiff cannot proceed on her claim of defamation. Moreover, even assuming *arguendo* that the search of her automobile was a potentially defamatory "statement," Plaintiff did not file her initial Complaint (Doc. No. 1) until December 29, 2008, over one year after the search occurred on February 9, 2007. Thus, her claim is also barred by the statute of limitations. N.C. Gen.Stat. § 1-54(3); *Gibson,* 465 S.E.2d at 58. Because Plaintiff fails to allege the existence of a defamatory statement published by Defendant, and her claim is barred under the statute of limitations, Plaintiff's claim for defamation will be dismissed.

### 2. *Invasion of Privacy*

North Carolina law recognizes a limited cause of action for invasion of privacy against a defendant who "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, ... if the intrusion would be highly offensive to a reasonable person." *Miller v. Brooks,* 472 S.E.2d 350, 354 (N.C.App.1996) (quoting *Smith v. Jack Eckerd Corp.,* 400 S.E.2d 99, 100 (N.C.App.1991)). "Generally, there must be a physical or sensory intrusion or an unauthorized prying into confidential personal records to support a claim for invasion of privacy by intrusion." *Broughton v. McClatchy Newspapers, Inc.,* 588 S.E.2d 20, 27 (N.C.App.2003). If premised on a physical intrusion of the person, "[t]he level of offensiveness for this tort is higher than the offensive touching required for battery." *Smith,* 400 S.E.2d at 100.

Plaintiff does not allege that Defendant's security personnel performed a search of her person, nor does she allege that any confidential records were discovered during the search. None of Plaintiff's al-

legations suggest that the search itself was performed in a particularly intrusive manner, let alone in a manner a reasonable person would find "highly offensive." *Miller,* 472 S . E.2d at 354. As with her claim for defamation, Plaintiff's main objection to the search on privacy grounds appears to be that it conveyed a negative message that she was not to be trusted. (Doc. No. 4: Am. Compl. ¶ 23(c)). Any message the search might have conveyed is wholly irrelevant, however, as North Carolina law does not recognize a tort for invasion of privacy through portrayal in a false light. *Broughton,* 588 S.E.2d at 29 (citing *Renwick v. News & Observer Pub. Co.,* 312 S.E.2d 405, 411-12 (N.C.1984). Because she fails to plead facts supporting an inference that the search of her automobile was highly offensive to a reasonable person, Plaintiff's remaining state law claim for invasion of privacy will also be dismissed.

## IV. CONCLUSION

**\*6** The Court has examined each of Plaintiff's claims and finds that none state a claim upon which relief may be granted.

**IT IS, THEREFORE, ORDERED** that:

1. The Defendant's Motion to Dismiss (Doc. No. 7) is **GRANTED;** and

2. The Plaintiff's Amended Complaint (Doc. No. 4) is **DISMISSED.**

W.D.N.C.,2010.
Curry v. Philip Morris USA, Inc.
Slip Copy, 2010 WL 431692 (W.D.N.C.)

END OF DOCUMENT



Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

**C**

United States District Court,
D. South Carolina,
Columbia Division.
Arlene A. JOHNSON, Plaintiff,
v.
DILLARD'S INC., Mike Hartline, and Chuck
Rhoads, Defendants.
**C/A No. 3:03-3445-MBS.**

Sept. 24, 2007.

Allen D. Smith, Thomas Kennedy Barlow, Childs
and Halligan, Columbia, SC, for Plaintiff.

Katherine Dudley Helms, William L. Duda, Ogle-
tree DeakinsNash Smoak and Stewart, Columbia,
SC, for Defendant.

**ORDER**

MARGARET B. SEYMOUR, United States Dis-
trict Judge.

**\*1** Plaintiff Arlene A. Johnson filed this action in
the Court of Common Pleas for Richland County,
South Carolina, on October 1, 2003, against her
former employer, Defendants Dillard's, Inc.
(Dillard's); her former supervisor, Mike Hartline;
and a another employee, Chuck Rhodes. Plaintiff
alleged that she was discriminated on the basis of
her race and sex in violation of Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. §
2000(e), et seq. ("Title VII"). She also asserted state
law claims for breach of contract, breach of con-
tract of implied covenant of good faith and fair
dealing, defamation, intentional infliction of emo-
tional distress (outrage), and tortious interference
with contract. Defendants removed the case to this
court on October 29, 2003. The action was stayed
pending arbitration. The stay was lifted on Novem-
ber 9, 2005.

Plaintiff filed an amended complaint on May 3,
2006. Plaintiff asserts claims for discrimination
based on race and sex in violation of Title VII and
42 U.S.C. § 1981 as to Dillard's (first cause of ac-
tion); breach of contract as to Dillard's (second
cause of action); defamation as to all Defendants
(third cause of action), intentional infliction of
emotional distress (outrage) as to all Defendants
(fourth cause of action), and tortious interference
with contract as to Defendants Hartline and Rhoads
(fifth cause of action). On December 22, 2006, the
parties stipulated as to the dismissal of all claims
against Rhoads in his individual capacity, as well as
the tortious interference with contract claim against
Defendant Hartline in his individual capacity.

This matter is before the court on Defendants' mo-
tion for summary judgment, which motion was filed
December 27, 2006 (Entry 34). Plaintiff filed a
memorandum in opposition on January 16, 2007, to
which Defendants filed a reply on January 26,
2007. In accordance with 28 U.S.C. § 636(b) and
Local Rule 73.02, D.S.C., this matter was referred
to United States Magistrate Judge Joseph R. Mc-
Crorey for pretrial handling. The Magistrate Judge
filed a Report and Recommendation on August 30,
2007 in which he recommended that Defendants'
motion for summary judgment be granted as to all
of Plaintiff's claims except her claim that she was
discriminated on the basis of her sex plus her race.
Defendants filed objections to the Report and Re-
commendation on September 14, 2007. Plaintiff
filed no objections to the Report.

The Magistrate Judge makes only a recommenda-
tion to this court. The recommendation has no pre-
sumptive weight. The responsibility for making a
final determination remains with this court. *Math-
ews v. Weber,* 423 U.S. 261, 270, 96 S.Ct. 549, 46
L.Ed.2d 483 (1976). The court is charged with
making a de novo determination of any portions of
the Report and Recommendation to which a specif-
ic objection is made. The court may accept, reject,
or modify, in whole or in part, the recommendation

Page 2

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

## I. *FACTS*

*2 The facts are fully discussed in the Report and Recommendation. Briefly, Plaintiff, who is a black female, began working for Dillard's in March 2000 as Area Sales Manager of the Men's Department at the Richland Mall store in Columbia, South Carolina. Plaintiff was supervised by Store Manager Angela Phillips. Phillips positively rated Plaintiff's performance for the March 2000-February 2001 period.

Defendant Hartline, a white male, replaced Phillips as Store Manager in March 2001. In October 2001, the Area Sales Manager of the Ladies Department was demoted because of slow sales in the department. Defendant Hartline offered the position to Plaintiff. Plaintiff resisted the change because she felt that the Ladies' Department was in disarray. Defendant Hartline told her, however, that the failure to accept the position would be negatively perceived and could result in restricting Plaintiff's opportunities for advancement.

Defendant Hartline terminated Plaintiff for poor sales performance on June 28, 2002. Plaintiff was replaced by Jim Huggins, a black male who had worked for approximately six years as the Area Sales Manager of the Shoe Department. Plaintiff filed a Charge of Discrimination with the South Carolina Human Affairs Commission (SCHAC) on August 25, 2002, asserting that she had been discriminated against on the basis of her race. Specifically, Plaintiff stated:

I. PERSONAL HARM:

I was terminated on June 28, 2002, by Mike Hartline, Store Manager.

II. RESPONDENT(S) REASON(S) FOR ADVERSE ACTION(S):

Low sales performance.

III. COMPLAINANT'S CONTENTION(S):

I contend the reason given for my discharge to be pretextual. Other white managers were not fired because of their low sales performance.

IV. DISCRIMINATION STATEMENT:

I therefore believe I have been discriminated against because of my Race (Black), in violation of the South Carolina Human Affairs Law, as amended, and Title VII of the United States Civil Rights Act of 1964, as amended.

Entry 34-12, p 16.

Plaintiff subsequently discovered that her position had been filled by Huggins. On January 27, 2003, Plaintiff, through counsel, wrote a letter to SCHAC, noting that Plaintiff wished to amend her Charge of Discrimination to add sex as a basis for her charge. Plaintiff informed SCHAC that she believed her termination was "based on a combination of these two discriminatory motives, and that her race and sex discrimination claims are not an 'either/or' proposition." Entry 38-6. Defendants were not provided a copy of the January 27, 2003 letter.

On March 3, 2003, Plaintiff amended her Charge to include a claim for discrimination based on sex, as follows:

I. I was terminated on June 28, 2002, by Mike Hartline, Store Manager.

II. I was told that I had low sales performance.

III. I contend that the reason given for my discharge to be pretextual. Other white male managers were not fired because of their low sales performance. Additionally, I was replaced by a male.

*3 IV. I therefore believe that I was discriminated against because of my race (Black) and my sex (Female), in violation of the South Carolina Hu-

Page 3

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

man Affairs Law of 1972, as amended, and Title VII of the United States Civil Rights Act of 1964, as amended.

Entry 34-12, p. 17.

## II. *DISCUSSION*

As noted hereinabove, Plaintiff has not objected to the Magistrate Judge's recommendations that summary judgment be granted in favor of Defendants as to Plaintiff's causes of action for discrimination under 42 U.S.C. § 1981, breach of contract, defamation, intentional infliction of emotional distress (outrage), and tortious interference with contract. In the absence of objections to the Report, this court is not required to give any explanation for adopting the recommendation. *Camby v. Davis,* 718 F.2d 198, 199 (4th Cir.1983). The court has carefully reviewed the record and concurs in the recommendation of the Magistrate Judge that these causes of action should be dismissed. Accordingly, the court turns to Defendants' objections regarding the remaining Title VII claim.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to ... compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

To make a prima facie case, Plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the job and performed it satisfactorily; (3) she suffered an adverse employment action; and (4) she was treated differently than similarly situated employees outside of the protected class. *Brockman v. Snow,* 217 F. App'x 201 (4th Cir.2007) (citing *Autry v. N.C. Dep'tof Human Res.,* 820 F.2d 1384, 1385 (4th Cir.1987). If a prima facie case is presented, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Assuming the employer meets this burden of production,

the *McDonnell Douglas* framework-with its presumptions and burdens-disappears, and the sole remaining issue is discrimination vel non. *Hill v. Lockheed Martin Logistics Management, Inc.,* 354 F.3d 277, 285 (4th Cir.2004) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142-42, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). "In other words, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.' " *Id.* (quoting *Reeves,* 530 U.S. at 143). At this point, the burden to demonstrate pretext " 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.' " *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

### A.

Defendants first assert that the Magistrate Judge erred in recognizing sex-plus-race as a protected category under Title VII. The court disagrees.

**\*4** Defendants first contend that the Magistrate Judge failed to give proper effect to the term "or" because he did not read the words separated by the term "or" disjunctively. In the court's view, Defendants' construction of Title VII contravenes the overarching objective of Title VII, which is to cause employment to be based only upon applicable job qualifications. *See Griggs v. Duke Power Co.,* 401 U,.S. 424, 434 (1971). The court finds more persuasive the view of the Court of Appeals for the Fifth Circuit that the "use of the word 'or' evidences Congress' intent to prohibit employment discrimination based on any or all of the listed characteristics." *Jefferies v. Harris County Cmty. Action Ass'n,* 615 F.2d 1025, 1032 (5th Cir.1980). The Fifth Circuit noted, "[t]hat this was the intent of Congress ... is supported by the fact that the House of Representatives refused to adopt an amendment which would have added the word 'solely' to modify the word 'sex.' " *Id.* (citing 110 Cong. Rec. 2728

Page 4

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

(1964)). Defendants' objection is without merit.

Defendants also assert that allowing combination claims under Title VII arguably leads to results and protections beyond those intended by Congress. The court disagrees.

In *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 544, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971), the United States Supreme Court held that a plaintiff stated a claim under Title VII for gender discrimination based on her contention that an employer refused to hire women with pre-school age children, while hiring similarly situated men. A number of courts since *Phillips* have recognized that unlawful discrimination can exist when an employer discriminates not against the class of men or women as a whole, but against a subclass of men or women so designated by their sex plus another characteristic. *See Gee-Thomas v. Cingular Wireless,* 321 F.Supp.2d 875, 881 (M.D. Tenn.2004 (citing *Black v.Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 118 n. 7 (2d Cir.2004)); *Rauw v. Glickman,* 2001 WL 34039494, *8 (D.Or. Aug.6, 2001) (not reported); *McGrane v. Proffitts Inc.,* 2000 WL 34030843, *7 (N.D.Iowa December 26, 2000) (not reported). For example, in *Lam v. Univ. of Hawaii,* 40 F.3d 1551(9th Cir.1994), the plaintiff, an Asian woman, brought a claim of employment discrimination based in part on evidence that a senior white male professor involved in the hiring process harbored prejudicial feelings toward Asians and women. The Court of Appeals for the Ninth Circuit observed that:

> where two bases for discrimination exist, they cannot be neatly reduced to distinct components. Rather than aiding the decisional process, the attempt to bisect a person's identity at the intersection of race and gender often distorts or ignores the particular nature of their experiences. Like other subclasses under Title VII, Asian women are subject to a set of stereotypes and assumptions shared neither by Asian men or by white women. In consequence, they may be targeted for discrimination even in the absence of discrimina-

tion against Asian men or white women. Accordingly ... when a plaintiff is claiming race *and* sex bias, it is necessary to determine whether the employer discriminates on the basis of that *combination* of factors, not just whether it discriminates against people of the same race or of the same sex.

**\*5** *Id.* at 1562 (emphasis in original) (internal citations and quotations omitted).

In *Jeffers v. Thompson,* 265 F.Supp.2d 314, 326 (D.Md.2003), a district court in this Circuit allowed a race-and-gender claim, noting that "[l]ike other composite classes under Title VII, African-American women are subject to stereotypes and assumptions shared neither by African-American Males nor by Caucasian females. Consequently, they may suffer a distinct, but no less invidious discrimination." (citing *Jefferies,* 615 F.2d at 1032, *Lam, 40 F.3d at 1562).* The *Jeffers* court acknowledged that recognition of a composite class makes establishment of the prima facie case of discrimination easier, because "[t]he more specific the composite class, the more readily a plaintiff can demonstrate that the beneficiary of the contested employment decision does not belong to the class." *Id.* However, the *Jeffers* court also noted that, under the familiar *McDonnell Douglas* test, the ultimate burden of persuasion remains always on the plaintiff; [a]nd the more specific the composite class in which the plaintiff claims membership, the more onerous that ultimate burden becomes." *Id.* at 326-27. Defendants' objections are without merit.[FN1]

> FN1. The court notes that in an unpublished opinion the Fourth Circuit reviewed a case brought on the basis of race and national origin discrimination, albeit without specific discussion of the novelty of a combination claim. *See Siraj v. Hermilage in Northern Virginia,* 51 F. App'x 102 (4th Cir.2002).

B.

Page 5

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

Defendants next contend that the Magistrate Judge erred in finding that Plaintiff exhausted her administrative remedies. The court disagrees.

As the Magistrate Judge observed, a claimant must exhaust the administrative procedures enumerated in 42 U.S.C. § 2000e-5(b) before a federal court may assume jurisdiction over a claim under Title VII. The administrative remedies include an investigation of the complaint and a determination by the EEOC as to whether "reasonable cause" exists to believe that the charge of discrimination is true. The purpose of a charge of discrimination is to give notice to the charged party and provide a means for voluntary compliance and conciliation. *Evans v. Sheraton Park Hotel,* 503 F.2d 177 (D.C.Cir.1974). An administrative charge does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination. *Miles v. Dell, Inc.,* 429 F.3d 480, 491 (4th Cir.2005) (quoting *Bryant v. Bell Atlantic Md., Inc.,* 288 F.3d 124, 132 (4th Cir.2002)). Thus, " '[i]f a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in her subsequent civil suit.' " *Id.* (quoting *Smith v. First Union Nat'l Bank,* 202 F.3d 234, 247-48 (4th Cir.2000)).

In this case, Plaintiff filed an amended Charge which indicated both race and gender discrimination. In addition, she informed SCHAC that she wished to pursue a combination claim. Although Defendants did not receive a copy of this letter, an investigation of the combination claim could be expected to follow from a reasonable administrative investigation by SCHAC. Defendants' objection is without merit.

### C.

**\*6** Finally, Defendants contend that the Magistrate

Judge erred in finding evidence of pretext. Defendants object to a number of facts relied on by the Magistrate Judge and urge their interpretation of the facts. In the court's view, the arguments advanced by Defendants more properly should be considered by a jury. Viewing the facts in the light most favorable to Plaintiff, the court cannot say that it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law. *McKinney v. Bd. of Trustees,* 955 F.2d 924, 928 (4th Cir.1992). Defendants' objection is without merit.

### III. *CONCLUSION*

The court adopts the Report and Recommendation and incorporates it herein by reference. For the reasons stated therein and in this order, Defendants' motion for summary judgment is granted except as to Plaintiff's Title VII claim that she was discharged in violation of Title VII on the basis of her race plus gender.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

JOSEPH R. McCRORERY, United States Magistrate Judge.

Plaintiff, Arlene Johnson ("Johnson") filed this action in the Court of Common Pleas for Richland County, South Carolina on October 1, 2003. Defendants, Dillard's Inc. ("Dillard's"), Mike Hartline ("Hartline"), and Chuck Rhoads ("Rhoads"), removed this action to this court on October 29, 2003. Prior to filing this action, Dillard's filed an action FN1 seeking to compel Johnson to arbitrate her claims. This action was stayed (until November 9, 2005) during the pendency of the arbitration action. Johnson filed an amended complaint on May 3, 2006. She alleges claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981 ("

Page 6

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

§ 1981 ").[FN2] In addition, Johnson alleges claims under South Carolina law. On December 22, 2006, the parties filed a stipulation of dismissal with prejudice as to all claims against Rhoads in his individual capacity and as to the tortious interference claim with contract claim against Hartline in his individual capacity.[FN3]

> FN1. Civil Action Number 3:03-02522-MBS.

> FN2. Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

> FN3. In her memorandum in opposition to summary judgment, Johnson states that she voluntarily dismissed Rhoads as a defendant following discovery. Plaintiff's Opp. Mem. at 1. Thus, the remaining claims are only against Dillard's and Hartline.

On December 27, 2006, Defendants filed a motion for summary judgment. Johnson filed a memorandum in opposition to summary judgment on January 16, 2007. Defendants filed a reply on January 26, 2007.

### SUMMARY JUDGMENT STANDARD

When no genuine issue of any material fact exists, summary judgment is appropriate. *Shealy v. Winston,* 929 F.2d 1009, 1011 (4th Cir.1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Id.* Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. *Ballinger v. North Carolina Agric. Extension Serv.,* 815 F.2d 1001, 1005 (4th Cir.), *cert. denied,* 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). This does not mean that summary judgment is never appropriate

in these cases. To the contrary, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material fact.*" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985).

**\*7** In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 718 (4th Cir.1991) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." *Id.* at 718-19 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." *Baber v. Hosp. Corp. of Am.,* 977 F.2d 872, 874-75 (4th Cir.1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Id.* and *Doyle v. Sentry Inc.,* 877 F.Supp. 1002, 1005 (E.D.Va.1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (*see* Fed.R.Civ.P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. *Baber,* citing *Celotex Corp., supra.* Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1316 (4th Cir.1993) and *DeLeon v. St. Joseph Hospital, Inc.,* 871 F.2d 1229, 1233 (4th Cir.1989), n. 7. Un-

Page 7

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

supported hearsay evidence is insufficient to overcome a motion for summary judgment. *Martin v. John W. Stone Oil Distrib., Inc.,* 819 F.2d 547 (5th Cir.1987) and *Evans v. Technologies Applications & Servs. Co.,* 80 F.3d 954 (4th Cir.1996).

*FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFF*

1. Johnson, a black female, began working for Dillard's in March 2000 as Area Sales Manager ("ASM") of the Men's Department of Dillard's Richland Mall store. *See* Johnson Dep. 35-38.

2. Prior to working for Dillard's, Johnson was a store manager with Cato Corporation, a woman's department store chain. Johnson Dep. 23-30.

3. At the time Plaintiff accepted employment with Dillard's, the Richland Mall store was not achieving its sales goals. Johnson was aware of this when she accepted the job. Johnson Dep. 34-35.

4. As the Dillard's Richland Mall Men's Department ASM, Johnson was supervised by Store Manager Angela Phillips ("Phillips"). Johnson Dep. 34, 87.

5. Phillips positively rated Johnson's performance for the period of March 2000 to February 2001, although sales in the Men's Department continued to lag as compared to the prior year and as to the sales plan that had been projected for the Men's Department. Johnson Dep. 87, 153-155; Hartline Dep., Ex. 2.

6. In March 2001, Hartline, a white male, replaced Phillips as the Store Manager. Phillips reported to Walter Grammer ("Grammer"), Dillard's District Manager. Hartline Dep. 16.

**\*8** 7. In October 2001, Lara Anderson ("Anderson"), a white female who was ASM of the Ladies' Department, was demoted to an assistant sales manager position because of her de-

partment's slow sales. Johnson Dep. 101-102; Hartline Dep. 112-113 and Ex. 14.

8. Hartline, in consultation with his supervisor, Grammer, offered Johnson the Ladies' Department ASM position. Hartline Dep. 60; Grammer Dep. 42-43, 52.

9. Johnson initially resisted taking the job because she was offended that Hartline and Grammer made the decision without consulting her first, she thought she had made progress in the Men's Department and wanted to continue there so she could try to beat her numbers from the previous year, and she thought the Ladies' Department was in disarray and had problems that she did not want to be a part of cleaning up. Johnson Dep. 91-92. Hartline told Johnson that it would be frowned upon and would limit her opportunities if she did not accept the position. Johnson accepted the position even though she did not want it. Johnson Dep. 96.

10. Johnson received an increase in salary of approximately $48 per week. There was an increase in responsibility in becoming the Ladies' Department ASM. *See* Johnson Dep. 97-98.

11. During June 2002, Grammer learned that some of the stores in his district would undergo a "matrix change," meaning that the number of ASMs in some stores would change. Dillard's stores are assigned a certain number of ASMs and Assistant ASMs based on sales volume and those staffing numbers are referred to as a "matrix." Grammer Dep. 56-57.

12. On June 28, 2002, Hartline informed Johnson that her employment was terminated for poor sales performance. *See* Johnson Dep. 146-147, 227. She was given a written Documentation of Disciplinary Action form which advised that she was being terminated because:

On 3/18 Arlene was put on a 60 day countdown because of poor sales performance in her area.

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

Arlene has been allowed more than 60 days and has been counseled concerning her sales performance at least once during this time frame with no significant sales improvement. Year-to-date Arlene's sales rank last in the division. Month-to-date for June[,] Arlene's sales rank last in the division. Because of a pattern of ongoing, poor sales performance[,] Arlene's employment is terminated as of 6/28/02.

Johnson Dep. Ex. 10; Johnson Dep. 149-150.

13. Hartline and Charles Rhoads ("Rhoads"), the assistant store manager (also known as operations manager), left the store and went to lunch with Hartline's secretary. Hartline Dep. 143-149; Rhoads Dep. 63.

14. Johnson went back to her office to call her pastor and to gather her belongings. She took two trips to her car to empty her office of her personal belongings. Johnson Dep. 162-163, 168-169, 177.

15. At some point, Johnson emailed Grammer regarding her termination and asked him to conduct an investigation. Grammer Dep. 101-108 and Ex. 6; Johnson Dep. 179-180, 205-221 and Ex. 12.

**\*9** 16. Johnson saw her personnel file in the copy room adjacent to her office. She made a copy of her file and placed the file on Hartline's desk. Johnson took the copy of her file to her car and returned to the store. *See* Johnson Dep. 172-179.

17. Johnson decided to make some purchases before leaving the store. Johnson Dep. 181-187.

18. Johnson admits that she told some of the sale associates that she had been terminated and that some of the associates were crying. Johnson Dep. 184-186.

19. Upon his return from lunch, Hartline noticed that Johnson was still in the store and directed Lori Ryan ("Ryan"), a uniformed member of the Forest Acres Police Department who also worked for Dillard's, to escort Johnson from the store.

Hartline Dep. 155-163; Johnson Dep. 188-202.

20. Johnson asked Ryan if she was going to escort her from the store and Ryan said "yes." Johnson then asked if she was "being trespassed" and Ryan said she was not sure if that was what Hartline meant. Johnson then asked if they could speak with Hartline and the two went upstairs to Hartline's office. Johnson Dep. 190-193.

21. Johnson asked Hartline why he had called Ryan to escort her from the store. Hartline replied that he did not want Johnson in the store. Johnson admitted that she raised her voice at Hartline during the conversation. Johnson Dep. 193, 196.

22. Ryan thought that Johnson was "very belligerent" with Hartline. Hartline asked that Johnson be escorted from the premises. Tumlin [FN4] Aff., Ex. A (Security Activity Log).

> [FN4]. Lori Ryan is now Lori Tumlin. *See* Tumlin Aff., Para. 1.

23. Ryan escorted Johnson to her office to make sure she had not left anything behind and then walked Johnson out of the store. Ryan walked next to Johnson, side by side but not touching, on their way out of the store. On the way out of the store, Johnson did not speak to anyone, including Ryan. Johnson Dep. 197-201; Rhoads Dep. 75.

24. When Johnson returned home, Grammer called her, in response to her email, and told her that he had no information for her because he was not aware of what was going on, but he would check some things and get back to her. Grammer never contacted her again, even after Johnson submitted a formal request to Dillard's for an investigation. Grammer Dep. 100; Johnson Dep. 222-224 and Ex. 13.

25. On the date of Plaintiff's termination, Hartline submitted an email to Gene Baker concerning Plaintiff's termination. Hartline submitted an email to Grammer on July 1, 2002, in which he

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

responded to allegations in Johnson's email. Grammer Dep., Ex. 6; Hartline Dep., Ex. 14.

26. After Johnson's termination, Dillard's replaced her with Jim Huggins ("Huggins"), a black male who had worked for approximately six years as the Shoe Department ASM. *See* Plaintiff's Opp. Mem., Ex. B; Grammer Dep. 100; Hartline Dep. 14, 136.[FN5]

> FN5. Grammer incorrectly testified that Huggins was the Men's Department ASM. Grammer Dep. 100. He noted his error in his deposition sheet dated December 29, 2006 (prior to the filing of Plaintiff's Opposition Memorandum). Defendants' Reply, Ex. J.

27. Johnson filed a charge of discrimination with the South Carolina Human Affairs Commission ("SCHAC") on August 25, 2002. She claimed that she was discriminated against based on her race. Johnson Dep., Ex. 16.

**\*10** 28. Johnson claims that during the pendency of her charge she discovered that she had been replaced by Huggins, rather than the men's department manager, which she alleges was the natural progression and suspected Huggins had been placed there because he is black.

29. On March 3, 2003, Johnson amended her charge to include a claim for discrimination based on sex.

30. The Dillard's Richland Mall store closed in approximately April 2003. Grammer Dep. 12.

31. Johnson received a right-to-sue notice from the Equal Employment Opportunity Commission ("EEOC") in July 2003. Plaintiff's Amended Complaint at 2.

### DISCUSSION

Plaintiff alleges that Dillard's discriminated against

her on the basis of her race plus sex in violation of Title VII and § 1981.[FN6] She also alleges claims under South Carolina law for breach of contract (against Dillard's), defamation (against Dillard's and Hartline), and intentional infliction of emotional distress (against Dillard's and Hartline). Dillard's and Hartline contend that they are entitled to summary judgment because: (1) Johnson fails to establish a claim under Title VII or § 1981; (2) Johnson fails to establish a claim for breach of contract or breach of a covenant of good faith and fair dealing; (3) Johnson fails to establish a claim for defamation; and (4) Johnson fails to establish a claim for intentional infliction of emotional distress (also known as "outrage").

> FN6. The standard for establishing claims of employment discrimination under either Title VII or § 1981 is the same. *See Gairola v. Commonwealth of Virginia Dep't of General Serv.,* 753 F.2d 1281, 1285-86 (4th Cir.1985).

A. *Title VII and § 1981 Claims-Sex Plus Race Claim*

Johnson alleges that she has been discriminated against based on her sex plus race in violation of Title VII and § 1981.[FN7] Dillard's contends that it is entitled to summary judgment as to Johnson's Title VII and § 1981 claims because: (1) "sex plus race" is not a protected category under either Title VII or § 1981; (2) Johnson failed to exhaust her administrative remedies under Title VII for a "sex plus race" claim; and (3) Dillard's has provided legitimate, nondiscriminatory reasons for terminating Johnson's employment that she cannot prove are pretextual.

> FN7. In her amended complaint, Johnson's claims under Title VII and § 1981 appear only to be discrimination on sex plus race and she does not appear to have asserted that she was discriminated against based on only her sex or only her race. Defend-

Page 10

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

ants, in their motion for summary judgment, argue that Johnson has chosen to proceed solely on a sex plus race theory of discrimination. Defendants' Motion for Summary Judgment at 15. In her opposition memorandum, Johnson contends that her "Amended Complaint in this matter does not foreclose her from proving at trial that either her race or sex was a motivating factor under *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), since she has plainly alleged that both her race and sex motivated her termination. (Amended Compl. ¶ 23.)" Plaintiff's Opp. Mem. at 8.

### (1) Protected Category

Dillard's contends that sex plus race discrimination is not a separate protected category under Title VII. Johnson argues that this Court should recognize a Title VII claim for sex plus race discrimination because: (1) in *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971), the Supreme Court held that applying different standards to women with preschool aged children and men with pre-school aged children constituted sex discrimination in violation of Title VII, even if women without pre-school aged children were not discriminated against; (2) subsequent Circuit Courts of Appeals have relied on *Phillips* in specifically holding that a minority female plaintiff could state a claim of discrimination under Title VII on the basis of race, in combination with gender, even if the employer did not discriminate against white females or minority males;[FN8] (3) one district court within the Fourth Circuit has recognized the viability of a sex plus race theory alleged by a black female employee;[FN9] (4) the Fourth Circuit's holding in *Lewis v. Bloomsburg Mills, Inc.,* 773 F.2d 561, 564-566 (4th Cir.1985) strongly suggests that the Fourth Circuit recognizes a race plus sex category of discrimination;[FN10] (5) the courts should not recognize a "sex plus" or "race

plus" theory based on a combination with any other immutable characteristic, such as "sex plus marital status" or "race plus parenthood of small children," yet reject a "race plus" claim based on its combination with sex; and (6) if a race plus sex theory was not available, an employer would be permitted to specifically target black females, yet defeat discrimination claims by demonstrating that black male employees and white females were treated favorably. Dillard's contends that sex plus race is not a protected category under Title VII because: (1) the Fourth Circuit has neither accepted or rejected sex plus race as a protected category under Title VII; (2) Title VII, by its very language, does not provide protection to combinations of otherwise protected categories, prohibiting employment decisions from being based on an individual's "race, color, religion, sex, or national origin ..." 42 U.S.C. § 2000(e)-2 (emphasis added); (3) plaintiffs do not need the sex plus race category because it is sufficient to show that the protected trait was a motivating factor and there is no requirement to show that illegal motivation was the sole motivation; and (4) recognizing sex plus race as a protected category would create an inference of illegal discrimination every time an employer terminates and replaces an employee who is not the same sex and race because everyone would be outside the protected class.

FN8. *See Jefferies v. Harris County Cmty. Action Ass'n,* 615 F.2d 1025, 1032 (5th Cir.1980); *Lam v. Univ. of Haw.,* 40 F.3d 1551, 1562 (9th Cir.1994); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406 (10th Cir.1987).

FN9. *Jeffers v. Thompson,* 264 F.Supp.2d 314, 326 (D.Md.2003).

FN10. *Lewis,* the Fourth Circuit found that the district court did not abuse its discretion in declining to redefine a class of black female discriminates to include black male discriminates.

Page 11

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

*11 The Fourth Circuit has neither accepted nor rejected "sex plus race" claims. As noted above, the Supreme Court previously recognized a "sex plus" claim in *Phillips.* Although the Eastern District of Missouri rejected a race plus sex claim in *Degraffenreid v. General Motors Assembly Div.,* 413 F.Supp. 142 (E.D.Mo.1976), *rev'd in part,* 558 F.2d 480 (8th Cir.1977), the other cases cited by Dillard's to support its position do not "flatly reject" a sex plus race claim.[FN11] As noted above, the Fifth, Ninth, and Tenth Circuits have recognized composite claims in *Jefferies, Lam,* and *Hicks.*[FN12] Additionally, the District of Maryland concluded that the court must determine whether an employer discriminates on the basis of a combination of the factors of race and gender, not just whether it discriminated against people of the same race or the same sex. *Jeffers,* 264 F.Supp.2d at 326-327. Thus, for purposes of this report and recommendation, the undersigned will assume that Johnson may bring a sex plus race claim under Title VII.

FN11. *See Sherman v. American Cyanamid, Co.,* 188 F.3d 509 (6th Cir.1999) [Table] (declining plaintiff's request to consider her discrimination claim as an "older woman" because no Federal Court of Appeals had recognized such a claim and considering it would fail to change the result as plaintiff was unable to show that the defendant's reason was pretextual); *Logan v. Kautex Textron N. Am.,* 259 F.3d 635, 638, n. 2 (7th Cir.2001) ("without deciding whether we recognize a "sex plus" theory we refuse to analyze Logan's claim under such a theory because in her complaint she pleaded only discrimination on account of her race."); *Lacy v. Ameritech Mobile Communications,* 965 F.Supp. 1056, 1071, n. 16 (N.D.Ill.1997) (Noting that the only case cited by either party (*Degraffenreid* ) indicated that African-American males were not a protected class and stating that "[w]hile the court recog-

nizes that "race-sex" discrimination might be actionable under Title VII, the mere fact that Ameritech Cellular did not promote African-American male CSRs in 1991 and 1992 is not sufficient to show that the company's reason for not promoting Lacy was pretextual.")

FN12. In *Jefferies,* the Fifth Circuit concluded that discrimination against black females could exist even in the absence of discrimination against black men or white women. *Jefferies,* 615 F.2d at 1032. The Ninth Circuit, in *Lam,* stated that "when a plaintiff is claiming race and sex bias, it is necessary to determine whether the employer discriminates on the basis of that combination of factors, not just whether it discriminates against people of the same race or of the same sex." *Lam,* 40 F.3d at 1562. In *Hicks,* the Tenth Circuit concluded that "a trial court may aggregate evidence of racial hostility with evidence of sexual hostility." *Hicks,* 833 F.2d at 1416.

Dillard's also contends that sex plus race discrimination is not recognized or actionable under § 1981. The company, citing *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006), contends that Johnson cannot bring a sex plus race claim under § 1981 because § 1981 serves to proscribe only race discrimination in the making or enforcing contracts. Johnson cites no authority to support her contention that she can bring a sex plus race claim under § 1981, but contends that "the improper consideration of her race violated 42 U.S.C. § 1981, regardless of the fact that her sex was also a consideration." Plaintiff's Opp. Mem. at 9.[FN13]

FN13. To the extent that Johnson has properly alleged a separate race only claim under either Title VII or § 1981, she fails to establish a prima facie case of discrimination, as she was replaced by Huggins, a

Page 12

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

black employee.

Johnson has not shown that a sex plus race claim is viable under § 1981. Section 1981 (which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens....") does not apply to claims of sex/gender discrimination. *Runyon v. McCrary,* 427 U.S. 160, 167, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Cornell v. General Elec. Plastics,* 853 F.Supp. 221 (S.D.W.Va.1994).

(2) *Exhaustion of Remedies*

Dillard's contends that even if the Court recognizes a sex plus race cause of action, Johnson failed to exhaust her administrative remedies. Johnson argues that she exhausted her administrative remedies with regard to her sex plus race discrimination claim because: (1) Defendants make no claim that they were not on notice of Johnson's intent to pursue a race plus theory; (2) her SCHAC intake form referenced sex as a basis for discrimination; (3) she properly and timely amended her charge to indicate that she had been discriminated against on the basis of her race and sex and that she had been replaced by a black male; (4) her January 9, 2003 letter to SCHAC specifically asserts that she was discriminated against because she is a black female; (5) Plaintiff's counsel clearly outlined Plaintiff's "race plus" theory in a letter to SCHAC; (6) SCHAC's administrative investigation would have encompassed the race/sex combination; (7) Defendants cite no authority for the proposition that a charge alleging a combination of race and sex discrimination cannot form the basis for a "race plus" lawsuit; and (8) Plaintiff's amended charge is at least as specific as her amended complaint and Defendants have not challenged the sufficiency of her amended complaint or suggested that she has not properly pleaded a "race plus" claim in her amended complaint.

*12 In her first Charge, Johnson checked "race" as the cause of discrimination. She wrote:

II. RESPONDENT(S) REASON(S) FOR ADVERSE ACTIONS(S):

Low sales performance.

III. COMPLAINANT'S CONTENTION(S):

I contend the reason given for my discharge to be pretextual. Other white managers were not fired because of their low sales performance.

IV. DISCRIMINATION STATEMENT:

I therefore believe I have been discriminated against because of my Race (Black), in violation of the South Carolina Human Affairs Law, as amended, and Title VII of the United States Civil Rights Act of 1964, as amended.

Johnson Dep., Ex. 16. In a letter to SCHAC (which was not copied to Defendants) dated January 9, 2003, Plaintiff wrote:

I am writing to follow up on my telephone conversation with you the other day. As we discussed, I recently noticed that the box title[d] "Sex" on my charge of discrimination has not been checked. As I noted on the enclosed Initial Inquiry Questionnaire that I filled out with the Human Affairs Commission prior to filing my charge, I feel that both my race and sex were reasons that my supervisor, Mike Hartline, terminated my employment. Therefore, I wish to amend my charge of discrimination to reflect that I was discriminated against because I was an African-American female.

Johnson Dep., Ex. 18. In a January 23, 2003 letter to SCHAC (which was not copied to Defendants), Plaintiff's counsel wrote, in part:

As you and Ms. Johnson have discussed recently, Ms. Johnson wishes to amend her Charge of Discrimination to add sex as a basis for her charge, as she had originally noted on the intake form she completed upon filing her original charge.

Page 13

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

Ms. Johnson feels that she was terminated not just because she was black, but also because she was female. Thus, she feels that her termination was based on a combination of these two discriminatory motives, and that her race and sex discrimination claims are not an "either/or" proposition. Numerous courts have recognized that a black female subclass of discrimination victims can pursue a "sex plus race" discrimination claim under Title VII even if the employer has not discriminated against black males or white females.

Plaintiff's Opp. Mem., Ex. D. In her amended charge, Johnson checked the boxes for race and for sex. She wrote:

> III. I contend that the reason given for my discharge to be pretextual. Other white managers were not fired because of their low sales performance. Additionally, I was replaced by a male.
>
> IV. I therefore believe that I was discriminated against because of my race (Black) and my sex (Female) in violation of the South Carolina Human Affairs Law of 1972, as amended, and Title VII of the United States Civil Rights Act of 1964, as amended.

Johnson Dep., Ex. 17.

Before a federal court may assume jurisdiction over a claim under Title VII, "a claimant must exhaust the administrative procedures enumerated in 42 U.S.C. § 2000e-5(b), which include an investigation of the complaint and a determination by the EEOC as to whether 'reasonable' cause exists to believe that the charge of discrimination is true." *Davis v. North Carolina Dep't of Correction,* 48 F.3d 134, 137 (4th Cir.1995). Generally speaking, this court does not have subject matter jurisdiction under Title VII of claims omitted from the EEOC administrative charge. *Dennis v. County of Fairfax,* 55 F.3d 151, 156-57 (4th Cir.1995). However, an employee's claims in this court are not strictly limited by the allegations of the EEOC charge, but rather by the scope of the EEOC investigation which can reasonably be expected to result from the

charge of discrimination. *King v. Seaboard Coast Line R.R. Co.,* 538 F.2d 581, 583 (4th Cir.1976); *EEOC v. General Elec. Co.,* 532 F.2d 359, 362 (4th Cir.1976). In other words, a claim omitted from the administrative charge can be maintained in a Title VII complaint only where the claim is "reasonably related to the allegations and claims in the administrative charge or, if disclosed, the omitted claim could reasonably be expected to follow from the administrative investigation based on the deficient administrative charge." *Nicol v. Imagematrix, Inc.,* 767 F.Supp. 744, 753 (E.D.Va.1991). In *Nicol,* Judge Ellis engaged in a thorough discussion of this issue and concluded that the factual allegations contained in the narrative of the administrative charge must be analyzed to determine whether a claim is within the scope of the administrative charge of discrimination.

**\*13** Dillard's, citing *Miles v. Dell, Inc.,* 429 F.3d 480 (4th Cir.2005), contends that Johnson has not exhausted her administrative remedies because the letters she sent to SCHAC were not copied to Dillard's counsel. In *Miles,* the plaintiff filed a charge with the EEOC in which she alleged that she was discriminated against due to her sex and pregnancy. Five months after she filed her charge, Miles sent a letter to the EEOC that explicitly alleged retaliation. The letter was not served on the defendant. The Fourth Circuit found that Miles had not exhausted her administrative remedies as to a claim of retaliation because she did not check the box marked "retaliation" on her charge, did not include anything in her narrative about retaliation, and did not send a copy of her letter to the defendant. The Court stated "[i]t would be objectively illogical to view a private letter from a complaining party to the EEOC as constructively amending a formal charge, given that one of the purposes of requiring a party to file charges with the EEOC is to put the charged party on notice of the charges against it." *Miles,* 429 F.3d at 492. Here, although not expressly laid out as a sex plus race claim, Johnson has alleged in her amended charge that she was discriminated against on the basis of her sex and race.

Page 14

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

Counsel for Johnson expressly laid out a sex plus race claim in the January 2003 letter to SCHAC. Dillard's has not claimed that it was not on notice of Johnson's claim of sex plus race discrimination, only that Johnson did not explicitly state so in her amended charge. Here, a claim of sex plus race discrimination appears to be reasonably related to the allegations in Johnson's amended charge.

(3) *Framework*

   Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a Title VII claim by either of two methods of proof: (1) using a "mixed-motive" framework, whereby the plaintiff demonstrates, by way of direct or circumstantial evidence, that discrimination motivated the employer's adverse employment decision; or (2) using the familiar burden-shifting framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), whereby the plaintiff demonstrates, by way of circumstantial evidence, that the employer's proffered reason for the adverse employment action is merely a pretext for racial or gender discrimination. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 284-85 (4th Cir.2004) (en banc).

A plaintiff proceeding under the *McDonnell Douglas* framework establishes a prima facie case of discrimination by offering proof that:

   (1) he is a member of a protected class;

   *14 (2) he was qualified for his job and his job performance was satisfactory;

   (3) he was subjected to an adverse employment action; and

(4) the alleged adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination.

*See Gairola v. Commonwealth of Virginia Dep't of General Serv.,* 753 F.2d 1281, 1286 (4th Cir.1985); *Hughes v. Bedsole,* 48 F.3d 1376, 1383 (4th Cir.), cert. denied, 516 U.S. 870, 116 S.Ct. 190, 133 L.Ed.2d 126 (1995); *McDonnell Douglas,* 411 U.S. at 802.[FN14] *McDonnell Douglas* provides that, once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802. If the employer provides the required evidence of a non-discriminatory reason for the action, the plaintiff must then show that the proffered reasons were not the true reasons for the employment action, but were a pretext for discrimination. *Id.* at 804; *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In *Jeffers,* the district court noted that the ultimate burden of persuasion remains always on the plaintiff and that "the more specific the composite class in which the plaintiff claims membership, the more onerous that ultimate burden becomes." *Jeffers,* 264 F.Supp.2d at 326-327.

   FN14. To the extent that this action concerns a reduction in force ("RIF"), a plaintiff may establish a prima facie case by offering proof that: (1) she was protected under Title VII; (2) she was selected for discharge; "(3) [s]he was performing at a level substantially equivalent to the lowest level of those of the group retained; and (4) the process of selection produced a residual work force of persons in the group containing some unprotected persons who were performing at a lower level than that at which [s]he was performing." *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1315 (4th Cir.1993) (age discrimination); *Corti v. Storage Tech. Corp.,* 304 F.3d 336, 341,

Page 15

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

n. 6 (4th Cir.2002) (gender discrimination).

(4) *Prima Facie Case-Sex Plus Race Claim*

Dillard's concedes that, if this Court finds that black females are a separately protected category under Title VII, Johnson can likely demonstrate the required elements of her prima facie case. Thus, for purposes of summary judgment, the undersigned assumes that Johnson has established a prima facie case.

(5) *Legitimate/Non-Discriminatory Reason*

Dillard's has articulated a legitimate, nondiscriminatory reason for its actions, that Johnson's termination was based on a mandatory staff reduction resulting from a "matrix change" that occurred in June 2002. The company asserts that Dillard's Richland Mall store needed to reduce its ASMs by one, Grammer and Hartline looked at Johnson's rank among the other Ladies' Department ASMs in Grammer's district based on sales numbers for the current fiscal year to date (February 2002 to June 17, 2002) and the current month (June 2002) compared to the prior year's numbers for the same periods. Grammer and Hartline state that it was typical for Dillard's to look at year-to-date sales compared to the previous year when evaluating sales performance. Johnson was chosen for termination because her sales figures were last out of twenty-one Ladies' Department ASMs in Grammer's district for both year to date and the current month.

(6) *Pretext*

In the light most favorable to Johnson, she has presented evidence that Dillard's proffered reason for her termination was pretext for discrimination. At the time of her termination, Johnson was given a written Documentation of Disciplinary form that provided she was terminated for "a pat-

tern of ongoing, poor sales performance." Johnson Dep. Ex. 10. Dillard's, however, now contends that Johnson was terminated due to the matrix in what appears to be a reduction in force. In his deposition, Grammer conceded (Grammer Dep. 99) that without the matrix, Johnson's sales figures might have been sufficient to keep her employed. *See EEOC v. Sears Roebuck & Co.,* 243 F.3d 846, 854 (4th Cir.2001) (an employer's changing rationale for adverse employment action can be evidence of pretext).

**\*15** Dillard's also now argues that Johnson's prior counselings were not used as a basis to select her for termination (Defendants' Reply at 5-6). The Documentation of Disciplinary form, however, specifically states that Johnson was placed on a 60 day countdown on March 18, 2002, and she had no significant sales improvement after that time. Johnson denies that a countdown warning occurred or that Hartline had a meeting with her about her performance. *See* Johnson Dep. 123, 126-127, 130-132, 211-212. When Johnson copied her personnel file, there was a notation in it about such a meeting. Johnson, however, denies seeing the notation prior to her copying the file. Johnson Dep. 130. During discovery, Defendants produced another version of the document, to which Hartline added the notation "action witnessed by Charles Boorman, Store OPS Mgr." Johnson Dep. 132-133, Ex. 8; Hartline Dep. 106-107.

Johnson has presented additional evidence of pretext. Health Shealy ("Shealy"), a white male who had sales figures which were marginally worse than Johnson's sales figures from February to May 2002 (*see* Grammer Dep. 65), FN15 was not counseled about his sales figures during February to May 2002 or placed on a "countdown ." Although Grammer testified that there was no set path to becoming Ladies' Department ASM, Rhoads stated that the Men's Department ASM was typically promoted to the Ladies' Department ASM position (Rhoads Dep. 57). After Johnson was terminated, however, the Men's Department ASM (Chris Brown, a white

Page 16

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

male) was not chosen for Ladies' Department ASM. FN16 Additionally, although the information provided by Dillard's as to the matrix change is incomplete, it appears that only women were chosen for termination or demotion in Grammer's district in the Summer 2002 matrix change.

> FN15. Hartline states that it was possible that Shealy was not chosen for termination under the matrix because his June 2002 sales figures showed improvement. Hartline Dep. 133, 138; *see also* Grammer Dep. 65.

> FN16. Hours after Johnson's termination, Grammer emailed his supervisor in reference to Johnson's email and advised that Johnson could not possibly claim discrimination because she was being replaced by a black male. Hartline Dep., Ex. 15. Rhoads testified that Chris Brown was not selected to replace Johnson because he was not "meeting his sales." Rhoads Dep. 58.

B. *State Law Claims*

Johnson has also asserted state law claims, as discussed below.

(1) *Contract Claims*

Johnson alleges that Dillard's "Associate Work Rules, General Policies and Benefits" ("Policy Manual") created a contract of employment between Dillard's and its employees. She claims that Dillard's breached the contract by terminating her employment based in whole or in part on her race and sex and by treating her differently than similarly-situated employees. She also claims that Dillard's breached an implied covenant of good faith and fair dealing by terminating her on the basis of her race and sex and treating her differently than similarly-situated employees. Dillard's contends that it is entitled to summary judgment because: (1) Dillard's Policy Manual

does not contain mandatory terms which are sufficiently definite or binding on Dillard's to constitute contractual terms; (2) any statements allegedly made to Johnson by Dillard's management are insufficiently definite to constitute an oral contract; FN17 and (3) Johnson's allegations that Dillard's breached a contract by discriminating against her based on a combination of her sex and race fails because any mandatory language at issue did not involve contractual promises regarding any equal employment opportunity and there is no evidence that Dillard's discriminated against Johnson due to a combination of her sex and race.

> FN17. Johnson has not addressed this argument in her opposition memorandum and thus appears to have conceded this matter.

**\*16** Generally, in South Carolina, "an at-will employee may be terminated at any time for any reason or for no reason, with or without cause." *Hessenthaler v. Tri-County Sister Help, Inc.,* 365 S.C. 101, 616 S.E.2d 694, 697 (S.C.2005). However, "when an employer's at-will status has been altered by the terms of an employee handbook, an employee, when fired, may bring a cause of action for wrongful discharge based on breach of contract." *Id.* at 697. "The typical handbook employment case may be resolved by making three determinations. A handbook forms an employment contract when: (1) the handbook provision(s) and procedure(s) in question apply to the employee, (2) the handbook sets out procedures binding on the employer, and (3) the handbook does not contain a conspicuous and appropriate disclaimer." *Grant v. Mount Vernon Mills, Inc.,* 370 S.C. 138, 634 S.E.2d 15, 20 (S.C.Ct.App.2006).

The parties dispute whether the Policy Manual set out procedures binding on the employer. Johnson claims that the harassment policy contained in the Policy Manual constitutes a contract. This policy defines harassment to include such actions as "[d]iscriminating against any associate in work as-

Page 17

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

signments or job related training" and "[i]nterference with an associate's work." Johnson Dep. Ex. 6, at 5. Johnson also claims that the harassment policy constitutes a contract because it promises discipline by providing that "harassment of any associate ... will be considered justification for disciplinary or other appropriate action." Johnson also claims that a section of the Policy Manual titled "Disciplinary Action" contains language that forms a contract because it provides that "[t]he type of discipline issued will vary depending upon the nature of the conduct or violation." Johnson Dep. Ex. 6, at 5.

Johnson fails to show that Dillard's Policy Manual constituted an employment contract. The harassment policy provides steps that an employee is to follow if she is subjected to harassing conduct. Johnson has not claimed sexual or racial harassment in this case. Further, nothing in the harassment policy limits the right of Dillard's to terminate Johnson's employment. The disciplinary action policy is not binding because it contains permissive language and, contrary to Johnson's assertion, it does not provide specific disciplinary action in specific situations. *See Hesenthaler, supra; Storms v. Goodyear Tire & Rubber Co.,* 775 F.Supp. 862, 867 (D.S.C.1991) ("Non-mandatory and permissive language is evidence that the employer did not intend to create a binding agreement."); *Bagwell v. Fafard, Inc.,* 2007 WL 2022187 (D.S.C.2007) ("A policy providing that "[e]mployees shall be disciplined or discharged only for just cause ..." does not create a contract."); *King v. Marriott Int'l, Inc.,* 2007 WL 2302421 (D.S.C.2007) ("Marriott's promise that 'there will be no discrimination or recrimination' against an employee who asserts a complaint against the company does not create an expectation that employment is guaranteed or that a particular process must be complied with before an employee is terminated.").[FN18] It is, therefore, recommended that summary judgment is granted to Defendants as to Johnson's breach of contract claim.

FN18. Marriott's "Policy on Harassment &

Professional Conduct" provided:

> The Company strictly prohibits retaliation against any person by another associate for using this complaint procedure, reporting perceived harassment, or for filing, testifying, assisting or participating in any manner in any investigation, proceeding or hearing. An associate who brings such a complaint to the attention of the Company in good faith will not be adversely affected as a result of reporting the harassment.

*King,* 2007 WL 2302421 at *7.

**\*17** Johnson also alleges that Dillard's breached an implied covenant of good faith and fair dealing. "Under South Carolina law, there exists in every contract an implied covenant of good faith and fair dealing." *Shelton v. Oscar Mayer Foods Corp.,* 319 S.C. 81, 459 S.E.2d 851, 857 (S.C.Ct.App.1995), aff'd, 325 S.C. 248, 481 S.E.2d 706 (S.C.1997). The commercial contract covenant of good faith and fair dealing, however, is not implied in employment at-will. *Grooms v. Mobay Chemical Corp.,* 861 F.Supp. 497 (D.S.C.1991) (policy manual which was not written in mandatory terms and contained vague and unspecific language did not constitute an enforceable contract which would limit employer's right to discharge an at-will employee), aff'd, 993 F.2d 1537 (4th Cir.1993), cert. denied, 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993); *Satterfield v. Lockheed Missiles and Space Co., Inc.,* 617 F.Supp. 1359 (D.S.C.1985).

As discussed above, Johnson fails to show that the Policy Manual constitutes a contract between the parties, and thus she cannot show that Dillard's breached an implied covenant of good faith and fair dealing. *See Williams v. Grimes Aerospace Co.,* 988 F.Supp. 925, 941(D.S.C.1997) (An "implied covenant can attach only to an existing contract ... Therefore this covenant does not apply unless a contract first exists.") (citations omitted).

Page 18

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

#### (2) *Defamation*

Johnson alleges that Defendants defamed her by having her removed from the store by a uniformed police officer. She claims her removal from the store conveyed a defamatory meaning and suggested she was being terminated because of criminal or unlawful conduct and/or that she was engaging in some type of criminal or unlawful activity that made her a threat to the security of the store. Johnson alleges that the alleged defamatory act was observed by her co-workers and by customers. Defendants contend that they are entitled to summary judgment as to this claim because: (1) Defendants did not make a defamatory statement, (2) if Defendants made a defamatory statement it is conditionally privileged;[FN19] (3) Johnson has not proven special damages, and (4) any statement made by Defendants was truthful.

FN19. This privilege, recognized by the South Carolina Court of Appeals in *Manly v. Manly,* 291 S.C. 325, 353 S.E.2d 312 (S.C.Ct.App.1987), provides a qualified privilege in the following situation:

A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty.... The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits. *Id.* at 315 (quoting *Conwell v. Spur Oil Co. of W. South Carolina,* 240 S.C. 170, 125 S.E.2d 270,

274-75 (S.C.1962)). Here, however, the statement does not appear to have been made "to a person having a corresponding interest or duty."

The tort of defamation allows a plaintiff to recover for injury to his or her reputation as the result of the defendant's communications to others of a false message about the plaintiff. *Holtzscheiter v. Thomson Newspapers, Inc.,* 332 S.C. 502, 506 S.E.2d 497, 501 (S.C.1998). Defamatory communications take two forms: libel and slander. Slander is a spoken defamation while libel is a written defamation or one accomplished by actions or conduct. *Id.* If a communication is libelous, then the law presumes the defendant acted with common law malice. *Id.* Under South Carolina law, to state a cause of action for defamation, a plaintiff must show the existence of some message that (1) is defamatory, (2) is published with actual or implied malice, (3) is false, (4) is published by the defendant, (5) concerned the plaintiff, and (6) resulted in legally presumed or in special damages.[FN20] *Parker v. Evening Post Pub. Co.,* 317 S.C. 236, 452 S.E.2d 640, 644 (S.C.Ct.App.1994), *cert. denied,* 516 U.S. 1172, 116 S.Ct. 1263, 134 L.Ed.2d 211 (1996).

FN20. An allegedly defamatory statement can either be "actionable per se" or "not actionable per se." *Holtzscheiter,* 506 S.E.2d at 510. A statement that is actionable per se does not require proof of special damages. *Id.* A statement that is not actionable per se cannot support a defamation claim without evidence of "tangible losses or injury to the plaintiff's property, business, occupation or profession, capable of being assessed monetarily." *Id.* All libel is actionable per se, but slander is only actionable per se if it relates to one of the following five categories: (1) the commission of a crime of moral turpitude; (2) the contraction of a "loathsome disease"; (3) adultery; (4) lack of chastity; and (5)

Page 19

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

"unfitness in one's business or profession." *Id.* at 501. Whether a statement is actionable per se is a matter of law for the court. *Id.* at 510.

**\*18** Dillard's contends that having Johnson escorted from the store does not constitute a defamatory statement. Johnson claims that this action was a defamatory statement because the meaning of the action was plain and having her escorted out of the store constituted an assertion as to her character that was both derogatory and false.

Defamation need not be accomplished in a direct manner. *Eubanks v. Smith,* 292 S.C. 57, 354 S.E.2d 898 (1987); *Tyler v. Macks Stores,* 275 S.C. 456, 272 S.E.2d 633 (1980). A mere insinuation is actionable as a positive assertion if it is false and malicious and its meaning is plain. *Id.*

Here, Johnson has not shown that being escorted out of the store by the off-duty police officer was false and malicious and that its meaning was plain. She admits that she told sales associates, prior to her being escorted out, that she had been terminated on the basis of her sales. Johnson has not presented any evidence that anyone thought she was escorted from the store for engaging in any type of criminal or unlawful activity. The cases where South Carolina courts have found that a case should be submitted to a jury are distinguishable from this action. In *Mains v. K Mart Corp.,* 297 S.C. 142, 375 S.E.2d 311 (S.C.Ct.App.1988), the South Carolina Court of Appeals held that a combination of words and conduct from K mart employees (stopping and questioning a customer about a jacket he was wearing and escorting him to the back of the store) were sufficient to create a question of fact whether a published defamatory statement about a customer accused of shoplifting had established a defamatory statement. *Mains,* 375 S.E.2d at 314. The Supreme Court of South Carolina, in *Tyler,* found it was proper to submit to the jury a question of whether a customer had been defamed where he was required to take a polygraph test and immediately thereafter he and the store manager were discharged. *Tyler,*

272 S.E.2d at 634. This action is also distinguishable from the recent case of *Moore v. Rural Health Servs., Inc.,* 2007 WL 666796 (D.S.C. February 27, 2007) in which the District Court denied the defendant's motion for summary judgment on the issue of defamation where the plaintiff alleged that a Sheriff's Deputy was called to escort plaintiff out of the building and while the plaintiff was trying to gather his belonging, a member of defendant's board of directors loudly stated in front of defendant's employees and patients that the plaintiff was stealing defendant's items and demanded that the Sheriff's Deputy search plaintiff's car. *Id.* at *4-5. Other courts have found that where a terminated employee was merely walked off the premises, even by a uniformed officer, the conduct was not defamatory as a matter of law. *Bagby v. General Motors Corp.,* 976 F.2d 919 (5th Cir.1992); *Davis v. Johns Crane, Inc.,* 261 Ill.App.3d 419, 199 Ill.Dec. 133, 633 N.E.2d 929, 938 (Ill.App.Ct. 1st Dist.1994); *Dubrovin v. Marshall Field's & Co. Employee's Credit Union,* 180 Ill.App.3d 992, 129 Ill.Dec. 750, 536 N.E.2d 800 (Ill.App.Ct. 1st Dist.1989); *Brown v. Gino Morena Enters.,* 44 F.Supp.2d 41 (D.D.C.1999); [FN21] *Gay v. William Hill Manor, Inc. .,* 74 Md.App. 51, 536 A.2d 690, 693 (Md.Ct.Spec.App.1988).

FN21. In *Brown,* the court also stated that, in determining whether having an employee escorted off the premises should support a claim for defamation, a court should consider the public policy implications of subjecting an employer to potential liability for taking the precautionary action of calling for an escort to avoid possible disruption by a terminated employee. *Brown,* 44 F.Supp.2d at 52-53 (citing *Tynes v. Shoney's Inc.,* 867 F.Supp. 330, 334 n. 4 (D.Md.1994) ("it would be extremely unsound as a matter of public policy to subject the owner of the establishment to civil liability every time the police are called to prevent a conflagration from erupting.")

Page 20

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

(3) *Outrage (Intentional Infliction of Emotional Distress)*

   **\*19** Johnson claims that by contacting local police and having a uniformed police officer remove her from the store, Defendants performed an act that any reasonable person would find outrageous. Defendants contend that they are entitled to summary judgment as to this claim because her allegations are already covered by her cause of action for defamation and the conduct alleged does not satisfy an outrage claim. Johnson claims that her defamation claim does not preclude her claim for intentional infliction of emotional distress at the summary judgment stage.

South Carolina expressly recognized the cause of action of intentional infliction of emotional distress, sometimes referred to as "outrage," in *Ford v. Hutson,* 276 S.C. 157, 276 S.E.2d 776 (S.C.1981). To recover under the tort of outrage, a plaintiff must establish the following elements:

   (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct;

   (2) the conduct was so "extreme and outrageous" as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community";

   (3) the actions of the defendant caused the plaintiff's emotional distress; and

   (4) the emotional distressed suffered by the plaintiff was "severe" so that "no reasonable man could be expected to endure it."

*Id.,* at 778 (quoting *Vicnire v. Ford Motor Credit Co.,* 401 A.2d 148 (Me.1979)) (internal citations omitted); *see also Wright v. Sparrow,* 298 S.C. 469, 381 S.E.2d 503, 505 (S.C.Ct.App.1989). In considering the defendant's motion for summary judg-

ment, the court must initially determine whether the conduct complained of " 'may reasonably be regarded as so extreme and outrageous as to permit recovery, and only where reasonable persons may differ is the question one for the jury.' " *Holtzscheiter,* 306 S.C. 297, 411 S.E.2d 664, 666 (S.C.1991), overruled on other grounds, 332 S.C. 502, 506 S.E.2d 497 (S.C.1998) (quoting *Todd v. South Carolina Farm Bureau Mut. Ins. Co.,* 283 S.C. 155, 321 S.E.2d 602, 609 (S.C.Ct.App.1984), quashed on other grounds, 287 S.C. 190, 336 S.E.2d 472 (S.C.1985)); *see also Barber v. Whirlpool Corp.,* 34 F.3d 1268, 1276 (4th Cir.1994) ("It is the court's responsibility to first determine as a matter of law whether or not the conduct was outrageous before submitting that question to the jury.").

Johnson has not shown that Defendants' conduct was sufficiently outrageous or intolerable so as to support a reasonable finding of outrage or intentional infliction of emotional distress. *See, e.g ., Hainer v. American Medical Int'l, Inc.,* 328 S.C. 128, 492 S.E.2d 103, 109 (S.C.1997) (Supreme Court affirmed trial court's directed verdict against plaintiff on her outrage claim, holding that her allegation that a hospital wrongfully reported her misconduct to a state disciplinary agency, even if the report was filed in bad faith and with malice, did not rise to the level of outrage); *Barber, supra,* (no outrageous conduct where employee, who was accused of theft and later terminated, was subjected to forty-minute meeting where his supervisor was verbally abusive, causing him to cry and to spend the entire weekend after the incident in bedroom and to contemplate suicide); *Gattison v. South Carolina State Coll.,* 318 S.C. 148, 456 S.E.2d 414 (S.C.Ct.App.1995) (mere "unprofessional and inappropriate" conduct did not exceed all possible bounds of decency); *Corder v. Champion Road Machinery Int'l Corp.,* 283 S.C. 520, 324 S.E.2d 79 (S.C.Ct.App.1984) (mere retaliatory discharge for filing worker's compensation claim, absent claims of verbal assaults or hostile, abusive encounters, did not rise to level required for tort of outrage),

Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622
**(Cite as: 2007 WL 2792232 (D.S.C.))**

*cert. denied,* 286 S.C. 126, 332 S.E.2d 533 (S.C.1985); *Brown v. Pearson,* 326 S.C. 409, 483 S.E.2d 477, 485 (S.C.Ct.App.1977) (plaintiffs' allegations, that a church covered up allegations of sexual abuse, did not establish a jury question). Further, Johnson has not presented any evidence of emotional distress so severe that no person could be expected to endure it.

*CONCLUSION*

**\*20** Based on the foregoing, it is recommended that Defendants' motion for summary judgment (Doc. 34) be denied in part, as to Plaintiff's claim that she was discriminated against under Title VII based on her sex plus her race, and granted in part as to all other claims.

D.S.C.,2007.
Johnson v. Dillard's Inc.
Not Reported in F.Supp.2d, 2007 WL 2792232 (D.S.C.), 101 Fair Empl.Prac.Cas. (BNA) 1622

END OF DOCUMENT



Not Reported in N.E.2d, 2000 WL 1434170 (Ohio App. 1 Dist.)
**(Cite as: 2000 WL 1434170 (Ohio App. 1 Dist.))**

**H**

Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF
LEGAL AUTHORITY.

Court of Appeals of Ohio, First District, Hamilton
County.
Julie ROLSEN, Plaintiff-Appellant/Cross-Appellee,
v.
LAZARUS, INC., Defendant-Ap-
pellee/Cross-Appellant.
**Nos. C-990588, C-990627.**

Sept. 29, 2000.

Civil Appeal From Hamilton County Court of Com-
mon Pleas. Judgment Appealed from is Affirmed in
Part, Reversed in Part, and Final Judgment Entered.
David Torchia and Tobias, Kraus & Torchia, for
plaintiff-appellant/cross-appellee.

Deborah Adams and Frost & Jacobs, and Robert P.
Joy, Morgan and Brown & Joy, for defendant-ap-
pellee/cross-appellant.

*OPINION*

GORMAN.

**\*1** Julie Rolsen was terminated from her job with
Lazarus, Inc., as Clinique Counter Manager, after
being accused of stealing a watch from the watch
department. Rolsen subsequently brought claims of
promissory estoppel, defamation, and breach of im-
plied contract against the company. A jury awarded
her $53,400 on her promissory-estoppel claim. The
trial court, however, granted a remittitur, reducing
the judgment to $17,833. Lazarus received directed
verdicts on the contract and defamation claims.

Both parties have appealed. Rolsen asserts in her
two assignments of error that the trial court erred
by granting Lazarus directed verdicts on the defam-
ation and contract claims and by reducing the dam-
age award. Lazarus, in its cross-appeal, asserts that
the trial court erred in denying its motions for a dir-
ected verdict, for a judgment notwithstanding the
verdict, and for a new trial on the promissory-estop-
pel claim. For the reasons that follow, we find no
merit in Rolsen's first assignment of error and con-
sider her second assignment moot. However, we
find merit in Lazarus's assignment of error in its
cross-appeal and, therefore, reverse the judgment of
the trial court on the promissory-estoppel claim.

FACTS

Rolsen's firing occurred on October 10, 1996, a day
on which she forgot to wear her watch to work at a
Dayton Lazarus store. Rolsen testified that, on that
day, there was a special promotional event, and
consequently she had a special need for a watch,
because makeover appointments were scheduled all
day and part of her duties was monitoring the con-
sultants performing the makeovers. In order to have
a watch to wear, she admittedly took a watch from
the display counter in the watch department, re-
moved the tag from the watch, placed the tag be-
hind the keyboard on the cash register so it would
not get lost, and then slipped the watch around her
wrist. She testified that she had seen other store em-
ployees similarly borrowing merchandise, such as
sweaters when they were cold, reading glasses
when they could not read tags, and barrettes when
they were required to wear their hair back. She
could not say, however, whether those other bor-
rowings by employees were done with permission
or otherwise condoned by store management.

Rolsen did not advise the watch-department sales
associate of her actions. When asked why she had
not, she explained that, in her view, the watch-
department sales associate was too far distant and
out of earshot. However, when she returned to the

Not Reported in N.E.2d, 2000 WL 1434170 (Ohio App. 1 Dist.)
(Cite as: 2000 WL 1434170 (Ohio App. 1 Dist.))

Clinique counter, Rolsen showed the watch to Mary Lynn Meier, a Clinique account coordinator who described herself as the "equivalent to a department manager of the store." Rolsen testified that she considered Meier her "boss" as well as her supervisor; Meier testified that Rolsen was her "subordinate." According to Meier, Rolsen came over to her, told her that she had left her watch at home, and then said words to the effect, "Look at this watch I have borrowed." Meier testified that Rolsen did not, however, tell her that she had taken the watch from the watch display counter, that she had taken the tag off the watch, or that she had chosen not to inform the watch-counter associate. Asked if she had said anything to Rolsen about whether her taking the watch was proper, Meier said, "No," although Meier did testify that she personally saw nothing wrong with Rolsen borrowing the watch. According to Rolsen, she believed that Meier had the authority to grant her permission to wear the watch, and that, by saying nothing critical, Meier had tacitly given her consent to what she had done. Meier testified, however, that she did not have the authority to give Rolsen or any other employee permission to take merchandise off the rack or counter and use it for a day.

**\*2** Rolsen and Meier both testified that Rolsen had asked Meier and another counter employee to remind her to take the watch off and return it before the end of the day. Rolsen and Meier then worked the counter until noon, at which point they left the store to have lunch together at a mall restaurant, Ruby Tuesdays.

While eating, the two women were interrupted by the security manager of the Lazarus store, Joyce Kyne, and a Lazarus security detective, Joe Hendrickson. Hendrickson had observed Rolsen taking the watch from the watch department-her actions were videotaped by surveillance cameras-and, believing that he had witnessed a theft, had reported the matter to Kyne. Kyne had instructed Hendrickson to put Rolsen under surveillance. Because Rolsen had left the store to go to lunch while

still wearing the watch, Kyne and Hendrickson followed her into the restaurant. When they appeared, Rolsen testified that she had immediately realized that the watch was the reason. Rolsen testified, "I said, 'Oh, my God, it's about the watch, isn't it?' I forgot to take the watch off before I went to lunch. I realized at that point that Joyce probably had not been briefed on what was happening, otherwise, she would not have been there."

Rolsen testified that Kyne had asked her to accompany her back to her office to discuss the matter. She stated that both Kyne and Hendrickson had "escorted me through the mall into the Lazarus store." According to Rolsen, her colleagues stared at the trio as they progressed through the store, since both Kyne and Hendrickson were known to other employees as being in charge of security. When they arrived at Kyne's office, Rolsen explained to Kyne the circumstances surrounding her wearing the watch and said that Meier could corroborate her story. Bob Monroe, the Human Resources Manager, was called into the office, and Rolsen repeated her story. According to Rolsen, both Kyne and Monroe refused her request that they speak to Meier to verify her story, each telling her that the incident did not concern Meier. Rolsen was told that if she had wished to make use of the watch for a day, she should have purchased it in the morning and returned it for a refund at the end of her shift.

Monroe then left the office to call corporate headquarters in Atlanta, and while he was awaiting a return call, he advised Rolsen that she was immediately suspended and would have to leave the store. Monroe and Hendrickson then walked Rolsen out of the store, dispatching someone else to get her belongings. Later that evening, Monroe called Rolsen at home to tell her that she had been fired due to the severity of the offense. She then went back to the store that same evening to get her remaining personal belongings. While doing so, she was kept under surveillance by security personnel. She described the scene at the Clinique counter as

Page 3

Not Reported in N.E.2d, 2000 WL 1434170 (Ohio App. 1 Dist.)
(Cite as: 2000 WL 1434170 (Ohio App. 1 Dist.))

emotional, with both her and her colleagues crying over her firing.

### DEFAMATION

In her first assignment of error, Rolsen argues that the trial court erred by granting Lazarus's motion for a directed verdict on her defamation claim. She contends that there was evidence of record upon which a reasonable person could conclude that Lazarus had defamed her by (1) announcing to her colleagues that she had been fired for theft, (2) having security personnel escort her through the store in front of her colleagues, and (3) making it necessary to indicate to prospective employers that she had been dismissed for theft.

**\*3** As this court has previously noted, when an act of alleged defamation has occurred in a business or professional context by someone whose job gives to them a legitimate interest in the matter, it is subject to a qualified privilege. The result is that the plaintiff must prove not only that the representations were untrue, but that they were made with actual malice. See *Contadino v. Tilow* (1990), 68 Ohio App.3d 463, 469-470, 589 N.E.2d 48, 52. A showing of actual malice requires evidence that the alleged perpetrator, acting out of spite or ill will, made the representations either with knowledge that they were false, see *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 331 N.E.2d 713, or with reckless disregard for the truth. See *New York Times Co. v. Sullivan* (1976), 376 U.S. 254, 84 S.Ct. 710.

To demonstrate a reckless disregard for the truth, the plaintiff must present clear and convincing evidence that the untrue statements were made as a result of the defendant's failure to act reasonably to discover the truth. See *Lansdowne v. Beacon Journal Publishing Co.* (1987), 32 Ohio St.3d 176, 180, 512 N.E.2d 979, 984. However, in order for the defendant to fail to act reasonably in such a situation, he or she must first possess some degree of subjective doubt concerning the statements. A person speaking with moral certainty about a subject with

which he or she has a qualified privilege, no matter how misguided, cannot be said to be acting with actual malice. As the Ohio Supreme Court has stated,

In order to establish "reckless disregard," the plaintiff must present sufficient evidence to permit a finding that the defendant had serious doubts as to the truth of his publication. Thus, the failure to investigate before publishing will not defeat a qualified privilege, unless the defendant entertained serious doubts as to the truth of the statements or the veracity or accuracy of his sources.

*A & B-Abell v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 12-13, 651 N.E.2d 1283, 1293-1294, citing *St. Amant v. Thompson* (1968), 390 U.S. 727, 88 S.Ct. 1323, and *Dale v. Ohio Civ. Serv. Emp. Assn.* (1991), 57 Ohio St.3d 112, 567 N.E.2d 253.

Examples of "reckless disregard" are situations in which the defendant fabricated the story, relies on his or her imagination, or based the statements on unverified, anonymous sources. See *id.* Because mere negligence is not enough to establish actual malice, the test for determining whether the defendant entertained "serious doubt" is not an objective one-*i.e.,* whether a reasonable person should have questioned the truth of his or her statements. Rather, the test is a subjective one, requiring the plaintiff to produce clear and convincing evidence that the defendant "in fact" entertained serious doubts about the truth of his statements or the sincerity or accuracy of his sources. *See id.*

The trial court's decision to grant Lazarus a directed verdict on the defamation claim presents this question of law: whether, construing the evidence most strongly in favor of Rolsen, reasonable jurors could have come to but one conclusion, that being that she was not defamed. *See Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 423 N.E.2d 467.

**\*4** Having reviewed the record, we hold that Rolsen did not present any evidence upon which a reasonable person could have concluded that any of the

Lazarus employees involved in her firing acted with actual malice. There is no evidence that any of the principals thought her innocent of what, in their view, constituted a form of in-store theft. Nor is there any evidence that they subjectively entertained "serious doubts" about whether what she did was impermissible under company rules. Rather, the evidence demonstrates that Kyne, Monroe, and Hendrickson were absolutely convinced that Rolsen's actions constituted a theft of the watch, even if they accepted her explanation. In the company's view, there was simply no authority upon which she could have borrowed the watch in such a manner without first paying for it. Thus, the fact that no one spoke to Meier to corroborate Rolsen's story is immaterial, since, in the view of her accusers, Meier was without authority to sanction what Rolsen had done.

Rolsen additionally argues that her physical treatment-for example, being led through the store by security-constituted a form of defamation by conduct under our decision in *Uebelacker v. Cincom Systems, Inc.* (1988), 80 Ohio App.3d 97, 608 N.E.2d 858. We disagree. The actions of the Lazarus employees here simply do not compare to the extreme, outrageous conduct of the company's employees in *Uebelacker.* Nor do we find persuasive Rolsen's argument that she was defamed by her own republication of the reason for her firing in applying for subsequent positions.

In sum, although the jury may have been given sufficient evidence to have wished that Lazarus had treated Rolsen more leniently and open-mindedly in light of the obvious mitigating factors involved, there was simply no evidence by which the jury could have clearly and convincingly found that the company's employees either spread deliberate falsehoods about Rolsen or possessed serious doubts that her borrowing of the watch constituted in-store theft. Thus, we affirm the trial court's decision to grant the company a directed verdict on the defamation claim.

## IMPLIED CONTRACT

Rolsen argues that the trial court erred by granting Lazarus a directed verdict on her claim that her firing violated an implied contract limiting the company's right to fire her at will. She bases this argument on three grounds: (1) that Lazarus had a practice of terminating employees only for just cause; (2) that Lazarus had a practice and policy of progressive discipline; and (3) that Meier's acquiescence in her borrowing of the watch constituted an implied promise that she would not be fired for doing so.

According to the express terms of her employment with Lazarus, Rolsen's employment was at will. An at-will employment may generally be terminated at any time by either party, for no reason or for any reason. See *Wright v. Honda America Mfg., Inc.* (1995), 73 Ohio St.3d 571, 653 N.E.2d 381. Concededly, the at-will status of an employee may be modified by a subsequent express or implied contract altering the at-will relationship. *See Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 483 N.E.2d 150, paragraph two of the syllabus. However, here the terms of Rolsen's employment expressly disclaimed that any company employee below the rank of Senior Vice President of Human Resources could alter her at-will status. Her employment application with the company spelled this out unequivocally, stating,

**\*5** I agree to conform to the rules and regulations of the Company, and if employed, I understand and agree that my employment is at-will and no employment contract rights have been created. I also understand and agree that my employment may be terminated at any time with or without cause, and with or without advance notice at the option of either the Company or myself. *I also understand that no supervisor, manager or other representative of the company has any authority to enter into any express or implied contract for employment for any specific period of time. Any agreement contrary to the above must be in writing and must expressly state that it is a contract and be signed by the Seni-*

*or Vice President, Human Resources.*

(Emphasis supplied.)

Given the express terms of Rolsen's employment, plainly stating that she was an at-will employee subject to termination "with or without cause" unless otherwise agreed to *in writing* by the Senior Vice President in charge of Human Resources, her arguments in favor of an implied contract are unpersuasive. See *Hall v. The Jewish Hosp. of Cincinnati* (June 2, 2000), Hamilton App. No. C-990571, unreported. Although several Lazarus employees testified that the company "d[id] not take personnel actions without good reason," this fact alone could not alter the express terms of Rolsen's employment. Every company, presumably, does not take personnel actions without good reason. Simply because a company does not fire its at-will employees arbitrarily does not mean that it has assented to a modification of their at-will status. If such were the case, a company would have to either espouse a policy or engage in a practice of random firings in order to avoid such a modification.

Rolsen's argument that Lazarus had a practice of progressive discipline, and that such a practice was not followed here, is similarly unpersuasive. The policy to which she refers appears in the employee handbook. The handbook, however, expressly disclaims that it creates any contractual rights. In fact, Rolsen was required to sign the following statement contained in the handbook: "I understand that nothing in this handbook is to be construed as a direct, implied or inferred contract of employment."

Finally, we reject Rolsen's argument that Meier's acquiescence in her borrowing of the watch constituted a promise that she would not be fired for doing so. According to the express terms of her employment, only the Senior Vice President in charge of Human Resources could alter the at-will nature of her employment *in writing.* Therefore, even if Meier had intended to make such a promise, she had no authority to do so. Second, as Lazarus correctly points out, there is no evidence to suggest

that Meier intended to make such a promise. As we have held before, simply because an employee chooses to subjectively believe that he or she is something more than an at-will employee, that does not create an implied contract. An implied contract requires more than just an inference by one of the parties; there must be a meeting of the minds and mutual assent. See *Weiper, supra; Reasoner v. Bill Woeste Chevrolet, Inc.* (1999), 134 Ohio App.3d 196, 730, 730 N.E.2d 992, 995.

**\*6** We hold, therefore, that there was no evidence of record from which a reasonable person could conclude that Lazarus had entered into an implied contract altering Rolsen's at-will employment status.

## PROMISSORY ESTOPPEL AND REMITTITUR

In her second assignment of error, Rolsen argues that the trial court erred by reducing the damages the jury awarded on her promissory-estoppel claim. In its sole assignment of error in its cross-appeal, Lazarus argues that the trial court erred in denying its motions for a directed verdict, a judgment notwithstanding the verdict, or a new trial on the same claim. Since it attacks the judgment itself, we address Lazarus's assignment first.

In addition to an implied contract, a second exception applies to the at-will doctrine: promissory estoppel. *See Mers, supra,* paragraph three of the syllabus. In order for this exception to apply, however, there must be a clear, unambiguous promise of employment by the employer, and the employee must reasonably rely on that promise. *See Mers, supra,* paragraph three of the syllabus; *Weiper, supra; Reasoner, supra.* The test is "whether the employer should have reasonably expected its representation to be relied upon by the employee, and if so, whether the expected action or forbearance actually resulted and was detrimental to the employee ." *Mers, supra,* paragraph three of the syllabus.

The basis of Rolsen's promissory-estoppel claim

Not Reported in N.E.2d, 2000 WL 1434170 (Ohio App. 1 Dist.)
**(Cite as: 2000 WL 1434170 (Ohio App. 1 Dist.))**

was that Meier's acquiescence in her borrowing of the watch constituted a promise, expressed in words and conduct, that "she would not be fired for using the watch." According to Rolsen, when she approached Meier and advised her of her plan to use the watch, "it was incumbent on Meier, if such conduct was improper, to stop it or to make Plaintiff aware of the consequences." Meier's failure to do so, she contends, made it reasonable for her to believe that Meier had given her authorization to use the watch, accompanied by a promise that she would not be fired for doing so.

The fallacy of this argument is several-fold. First, according to the express terms of her employment, only the Senior Vice President in charge of Human Resources could alter the terms of Rolsen's at-will employment. In fact, the express terms specifically stated that a manager-level employee did not have the authority to enter into a contract for extended employment. Thus, even if we assume that Meier had made a promise of continued employment, Rolsen's reliance upon it would not have been reasonable, since she was expected to have read and understood the language in her employment application. Second, Meier's words and actions, as nebulous as they were, fell far short of a clear, unambiguous promise of continued employment. Meier testified that she did not say anything to Rolson concerning the propriety of Rolsen taking the watch, commenting only upon its appearance-that she considered it unattractive. Although she testified that she did not personally feel that borrowing the watch was wrong, Meier did not convey any sort of promise to Rolsen that she was immune from punishment should she get caught by other company personnel ranked above her. Indeed, Meier could not have made such a promise since, as she testified, she knew she did not have the authority to grant employees leave to take merchandise for their own personal use.

**\*7** We hold, therefore, that, as a matter of law, Meier's words and conduct did not constitute a clear and unambiguous promise of continued employ-

ment. Her silence and failure to protest could have been construed in any number of ways, such as a personal willingness to allow Rolsen to wear the watch at her own risk. To hold otherwise would create a rule that passive acceptance by a lower-echelon store manager of a rules infraction that he or she has no authority to condone creates a binding promise on the company that no disciplinary action will be taken. Such a result is completely unsupported by law.

We thus find merit in Lazarus's assignment in its cross-appeal. Even construing the evidence most strongly in favor of Rolsen, reasonable minds could not have concluded that Meier had made a clear and unambiguous promise of continued employment, or that Rolsen's reliance on such a promise, even if made, was reasonable. We hold, therefore, that the trial court erred in denying Lazarus's motion for a directed verdict on Rolsen's promissory-estoppel claim. Consequently, Rolsen's second assignment of error, in which she argues that the trial court erred in reducing the damage award on this claim, is rendered moot.

In sum, we sustain Lazarus's sole assignment of error, overrule Rolsen's first assignment of error, and deem Rolsen's second assignment to be moot upon our validation of Lazarus's assignment of error. Thus, we affirm the judgment entered below to the extent that it granted directed verdicts to Lazarus on Rolsen's contract and defamation claims. However, upon our determination that the trial court erred in denying a directed verdict for Lazarus on Rolsen's promissory-estoppel claim, we reverse that portion of the judgment awarding Rolsen damages on her promissory-estoppel claim and enter judgment for Lazarus on that claim.

*Judgment accordingly.*

SUNDERMANN, J., concurs.
HILDEBRANDT, P.J., concurs separately.
HILDEBRANDT, P.J., concurring separately.
Before addressing Rolsen's employment claims, I would like to clarify my understanding of the

"actual malice" standard in defamation cases. The actual malice required for liability in defamation cases is different from the type of malice required to prove entitlement to punitive damages in other types of cases and has nothing to do with spite or ill will. In the context of a defamation claim, a person acts with actual malice when the person acts with "knowledge that the statements are false or with reckless disregard of whether they are false or not." [FN1] While spite or ill will might provide evidence of a defendant's reckless disregard for the truth of a statement, a plaintiff is not required to show the existence of spite or ill will to defeat a claim of privilege. In this case, Rolsen presented no evidence either that Lazarus either knew that the statements were not true or that it acted recklessly in that regard. I agree with the majority's disposition of that issue.

> FN1. See *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 331 N.E.2d 713, paragraph two of the syllabus; *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609, paragraph two of the syllabus; *A & B-Abell Elevator Co. v. Columbus /Central Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 651 N.E.2d 1283; see, also, *Gureasko v. Bethesda Hosp.* (1996), 116 Ohio App.3d 724, 689 N.E.2d 76.

**\*8** Turning to the employment-law issues, I write separately to emphasize my belief that the existence of a disclaimer in a handbook will not always defeat an implied-contract claim based on conduct or representations outside of the handbook.

In *Wing v. Anchor Media, Ltd. of Texas,* the Supreme Court of Ohio held that "[a]bsent fraud in the inducement, a disclaimer in an employee handbook stating that employment is at will precludes an employment contract other than at will *based upon the terms of the employee handbook.*" [FN2] In *Atkinson v. International Technegroup, Inc.,* [FN3] the employment manual stated specifically that employment was at will. However, managers from the company testified that the company had a *policy* to treat em-

ployees fairly and not to discharge employees except for a good reason. The managers practiced this policy, and the employee was aware of its application in specific circumstances. In *Atkinson,* this court upheld the jury verdict in the plaintiff's favor on his implied-contract claims despite the disclaimer.

> FN2. (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph one of the syllabus (emphasis added).

> FN3. (1995), 106 Ohio App.3d 349, 666 N.E.2d 257.

Thus, even if a handbook contains a disclaimer, the disclaimer will preclude only those contract claims based on the terms of the handbook and will not preclude a claim of implied contract based on the course of dealing between the parties or other facts and circumstances reflecting the implicit and explicit terms of an employee's employment. In this case, apart from the handbook, Rolsn only presented the statements of a few employees that Lazarus did not make personnel decisions without good reason. Her evidence fell far short of demonstrating the type of policy that existed in *Atkinson* despite the disclaimer in the handbook. Her evidence failed, as a matter of law, to show that fair treatment and just-cause discharge were implied conditions of her employment.

Likewise, a disclaimer in an application or a handbook should not preclude a plaintiff from establishing a claim of promissory estoppel in an appropriate case. The basis of a claim for promissory estoppel is detrimental reliance. The elements are distinct from those of a contract claim. The court stated in *Wing* that the existence of a disclaimer in a handbook precludes a *contract claim* "based upon the *terms of the employee handbook.*" [FN4] I do not believe that the disclaimer should be extended to preclude non-contract claims based on conduct or representations made outside of the handbook. [FN5]

> FN4. (1991), 59 Ohio St.3d 108, 570

N.E.2d 1095, paragraph one of the syllabus.

FN5. See *Randleman v. Dick Masheter Ford, Inc.* (Aug. 22, 1991), Franklin App. No. 91AP-201, unreported. (disclaimer in application bars claim of implied contract based on application, but not claim of estoppel based on other promises).

In this case, the only promise on which Rolsen allegedly relied was the silence of the manager when Rolsen showed her the watch that she was wearing. Her evidence was insufficient, as a matter of law, to demonstrate the type of reasonably specific promise or statement that is required for an estoppel claim. I do not think that we need to reach the question of whether her reliance was reasonable. However, since the majority has addressed this issue, I am concurring separately to state my disagreement with the proposition that Rolsen's reliance was, as a matter of law, unreasonable because of the disclaimers in the Lazarus handbooks.

**\*9** Finally, I disagree with the statement of the majority that "every company, presumably, does not take personnel actions without good reason." With the numerous decisions in this state alone upholding jury or bench awards on discrimination claims, the existence of employers like the one in *Wing* who terminate employees who call attention to their employer's illegal acts, and the policy in this state of upholding the right of an employer to terminate an employee for any reason or no reason, I cannot agree that "every employer" makes personnel decisions for good reasons. The presumption used in employment cases like this one is not that the employer discharged the employee for a good reason, but that the reason, whether good or bad, is irrelevant to the lawfulness of the decision. Even if the employer in this case had a good reason to terminate Rolsen's employment, the majority's statement is far too broad.

For the foregoing reasons, I separately concur in this case.

*Please Note:*

The court has placed of record its own entry in this case on the date of the release of this Opinion.

Ohio App. 1 Dist.,2000.
Rolsen v. Lazarus, Inc.
Not Reported in N.E.2d, 2000 WL 1434170 (Ohio App. 1 Dist.)

END OF DOCUMENT



946 F.2d 888, 1991 WL 195754 (C.A.4 (N.C.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 946 F.2d 888, 1991 WL 195754 (C.A.4 (N.C.)))**

NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. See CTA4 Rule 32.1.

United States Court of Appeals, Fourth Circuit.
Cathy Arrowood WALKER, Plaintiff-Appellee,
v.
SULLAIR CORPORATION, Defendant-Appellant,
and
John LEWIS, Defendant.
Cathy Arrowood WALKER, Plaintiff-Appellant,
v.
SULLAIR CORPORATION, Defendant-Appellee,
and
John LEWIS, Defendant.
**Nos. 90-2124, 90-2132.**

Argued June 3, 1991.
Decided Oct. 3, 1991.

Appeals from the United States District Court for
the Western District of North Carolina, at Char-
lotte. James B. McMillan, Senior District Judge.
(CA-87-215-C-C-M)
Argued: Phillip Marshall Van Hoy, Van Hoy & Re-
utlinger, Charlotte, N.C., for appellant.

Mark A. Michael, Michael & Meierhoefer, Char-
lotte, N.C., for appellee.

W.D.N.C., 736 F.Supp. 94.

AFFIRMED IN PART AND REVERSED IN
PART.

Before K.K. HALL and PHILLIPS, Circuit Judges,
and ELLIS, United States District Judge for the
Eastern District of Virginia, Sitting by Designation.

OPINION

PHILLIPS, Circuit Judge:

**\*1** This is an appeal following trial of the Title VII
and state-law tort claims of Cathy Arrowood Walk-
er against her former employer, Sullair Corporation
(Sullair). Before a jury, Walker prevailed on an in-
tentional infliction of emotional distress claim and
was awarded compensatory and punitive damages
in the amount of $103,500. Sitting as the trier of
fact on the Title VII claim, however, the District
Court ruled in favor of the defendant, Sullair. Be-
cause we conclude that Walker's evidence was in-
sufficient to support a finding of liability on Walk-
er's state-law claim, we reverse the court's denial of
Sullair's motion for judgment notwithstanding ver-
dict. On the other hand, finding no error in the
court's dismissal of Walker's Title VII claim, we af-
firm that dismissal.

I

Cathy Walker was employed as a clerical employee
in Sullair's Charlotte, North Carolina office begin-
ning in 1981. Between 1982 and 1984, Walker en-
gaged in consensual sexual relations with a man-
ager in her department, Jon Lewis, on several occa-
sions. The parties agree that Lewis neither
threatened Walker, nor offered her any special
treatment as an employee in exchange for her parti-
cipation. In late 1982, shortly after their first liais-
on, Walker was hospitalized for six weeks, receiv-
ing psychiatric treatment for severe headaches.
Lewis and Sullair were aware of the fact that Walk-
er had been hospitalized for these headaches. In
April 1985, about nine months after Lewis and
Walker engaged in sexual relations for the last
time, Walker married another person.

Walker introduced evidence indicating that, after
Lewis and Walker ended their sexual relationship,
Lewis began to abuse Walker verbally in the office
and entered a series of negative evaluations in her
personnel file. The gist of her claim in this action is

946 F.2d 888, 1991 WL 195754 (C.A.4 (N.C.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 946 F.2d 888, 1991 WL 195754 (C.A.4 (N.C.)))**

that this negative treatment was a direct result of the discontinuation of their sexual relationship. In support, she has relied on the fact that from 1981 to 1985, her personnel file reflected excellent job performance reviews; but that after April of 1985, Lewis began entering a series of negative comments in her file. Walker has conceded, however, that most of these comments were in fact accurate descriptions of her conduct, specifically, that she arrived late to work, talked extensively on personal phone calls during work hours, and took extended lunch hours.

By the summer of 1986, Walker and her supervisor, Bob Bogaert, had filed complaints with the Employee Relations division of Sullair. These complaints implied-but did not state clearly-the earlier sexual affair between Lewis and Walker and that her alleged workplace abuse might be related to the ending of that liaison. In August 1986, Walker contacted the Equal Employment Opportunity Commission. She claimed in this litigation that she informed Sullair of this fact, and that the company requested that she refrain from making a formal filing until an internal investigation could be performed. Two Sullair personnel officials, based in Indiana, later visited the Charlotte office. They interviewed most of the employees in the office. With the exception of Bogaert and Lola Jones, a friend of Walker's, Walker's fellow employees overwhelmingly agreed that Walker was receiving privileged treatment from Lewis. These fellow employees stated that Lewis tolerated tardiness, poor attendance, and other poor conduct from Walker. Walker testified that, following these interviews, the Sullair personnel officials told Walker that she was overreacting to Lewis' sense of humor and that she should be careful not to damage his good reputation. They then returned to Indiana where their notes from the investigation were lost or destroyed.

**\*2** Shortly after this visit, Walker "collapsed, physically and emotionally". Since September 1986, she has remained under the care of a psychiatrist.

In September of 1986, Walker filed charges with the EEOC, which issued a right-to-sue letter. Walker then brought this action against Sullair and Lewis, alleging violations of Title VII by workplace sexual harassment and parallel state tort claims of malicious prosecution and intentional infliction of emotional distress. Following denial of Sullair's motion for summary judgment, the case went to trial which resulted in a hung jury on the state-law tort claims. After this trial, Walker settled her claims against Lewis and the action against him was dismissed with prejudice. The case was then retried solely against Sullair. On the retrial, the jury returned a verdict for Walker on the intentional infliction claim only, awarding compensatory and punitive damages totalling $103,500. The jury rejected the malicious prosecution claim. The district court, however, sitting as trier of fact on the same evidence, found in favor of Sullair on the Title VII sexual harassment claim. Sullair then moved for judgment notwithstanding the verdict on the emotional distress claim, which the court denied. Sullair and Walker both appeal.

II

The first issue is whether the district court erred in denying Sullair's motion for JNOV on the grounds that the evidence at trial was insufficient, under North Carolina tort law, to support the verdict of intentional infliction of emotional distress.

Here we encounter at the start a procedural muddle to which both parties have contributed. At trial, the record seems to indicate fairly clearly that Walker proceeded, at least alternatively, on a theory of Sullair's vicarious liability for Lewis' conduct. Evidence of that conduct was introduced without objection, and the district court instructed the jury in a way which suggested that Lewis' conduct was relevant to the claim. Sullair, for its part, did not object to this aspect of the instructions. The jury's verdict gives no indication of the theory upon which it found Sullair liable, whether for its own conduct in dealing with Walker, or vicariously for Lewis' conduct.

946 F.2d 888, 1991 WL 195754 (C.A.4 (N.C.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 946 F.2d 888, 1991 WL 195754 (C.A.4 (N.C.)))**

On this appeal, Sullair has raised the point that under North Carolina law, Walker's settlement and voluntary dismissal of her claim against Lewis in advance of the second trial against Sullair alone precluded any vicarious liability claim against Sullair. *See Harrison v. Edison Bros. Apparel Stores, Inc.,* 924 F.2d 530, 534 (4th Cir.1991) (citing North Carolina authority). This presents a potential problem: it is not too clear that Sullair ever raised this point-effectively a defense of issue preclusion-in the district court. But, as things developed, Walker has in turn effectively removed that problem by conceding on appeal that the vicarious liability claim is precluded under North Carolina preclusion law. This then leaves her with the necessity to invoke some other theory of liability upon which to sustain her verdict. She has advanced one. Contending that she has never relied upon vicarious liability, she claims now and always only to have sought to prove Sullair's direct liability for intentionally inflicting emotional distress upon her.

**\*3** We might well be dubious, given the record of trial, that this was the only theory upon which her claim against Sullair was tried and submitted to the jury. But, for purposes of this appeal, we may assume that it was, because if it was, entitling Walker to rely upon it here, the evidence is insufficient to support such a theory of direct liability.

Her contention, advancing this theory, is that Sullair's conduct, independently of Lewis'-specifically its "refusal to take timely remedial measures once the problem [of Lewis' misconduct] was brought to its attention"-constituted a direct, intentional infliction of emotional distress upon her. The specific evidence to which she points, in addition to Sullair's ultimate non-action, is that concerning the failure of the Sullair employees sent from the Indiana office to take any remedial action following their investigative visit, and their positive discouragement of any effort by Walker to pursue remedial action against Lewis.

Simply put, such conduct, essentially non-action, no matter how blameworthy if it did indeed occur as Walker contends her evidence shows, does not approach the level of "outrageousness" which is the crux of this tort under North Carolina law.

North Carolina, as do other jurisdictions which in recent years have recognized this drastic tort, imposes a most stringent standard for its proof. A claimant must establish (1) extreme and outrageous conduct, (2) which is intended to cause and does cause, (3) severe emotional distress. *Dickens v. Puryear,* 276 S.E.2d 325, 335 (N.C.1981). As the *Restatement (Second) of Torts* has commented upon the type of conduct which this tort makes culpable, it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* § 46, comment d (1965). That standard of course excludes a great deal of conduct that is undoubtedly very bad and is properly considered reprehensible. The North Carolina cases applying the standard in the employment context mainly illustrate just how bad and reprehensible conduct must be to constitute the level of outrageousness required to impose liability for this tort. The following are examples of employers' treatment of employees found to fall short of that level: wrongful discharge of an employee by an official who knew that the employee's professional standing was the most important thing in her life, and who nevertheless deliberately assembled groups of her fellow employees to report to them that the employee was discharged for "a lack of credibility," *Trought v. Richardson,* 338 S.E.2d 617 (N.C.App.1986); refusing to grant an employee pregnancy leave, requiring her to carry heavy objects during pregnancy, and discharging her when she took leave without permission to visit the hospital for medical attention, *Hogan v. Forsyth Country Club, Co.,* 340 S.E.2d 116 (N.C.App.1986); discharging an employee in a manner that was "abrupt, without cause, and unexplained," *McKnight v. Simpson's Beauty Supply, Inc.,* 358 S.E.2d 107 (N.C.App.1987).

**\*4** North Carolina cases finding conduct suffi-

946 F.2d 888, 1991 WL 195754 (C.A.4 (N.C.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 946 F.2d 888, 1991 WL 195754 (C.A.4 (N.C.)))**

ciently "outrageous" to impose liability under this tort seem to have been confined to instances of actual physical assault, deliberate subjection to public embarrassment or shame, and the like. Thus, in *Hogan,* allegations of sexual touching, sexually suggestive comments, and ongoing sexual harassment were held to state a viable claim; in *Dickens,* conduct that involved luring the claimant to a secluded location, holding him at gunpoint, handcuffing him to a piece of machinery, cutting his hair with a knife, beating him with nightsticks, threatening him with castration and death, and ordering him to leave the state, was found sufficiently "outrageous" to meet the standard; and in *West v. King's Dep't Store, Inc.,* 365 S.E.2d 621 (N.C.1988), the public detention for over an hour of a person falsely accused of shoplifting was found sufficiently outrageous.

Here, with any claim of vicarious liability for Lewis' conduct out of the way, Walker is left with Sullair's failure to take remedial action respecting a workplace situation that, if proven as alleged, was undoubtedly a bad one that it had some duty to remedy. But it is obvious that such a default, no matter how irresponsible, unaccompanied by any deliberate public humiliation or the like, could not rise to the level of outrageousness which the North Carolina cases demonstrate is required.

Accordingly, we conclude that if, as Walker has now conceded, the only claim properly before the district court was one of Sullair's direct liability for intentional infliction of emotional distress, the district court erred (though understandably in view of the confused litigation position of both parties at that point) in refusing to grant Sullair's motion for JNOV.

### III

Walker's cross-appeal challenges the district court's rejection on the merits of her Title VII claim against Sullair charging its failure to remedy a "hostile workplace environment" created by Lewis'

sexual harassment. She claims that the jury's verdict in her favor on her intentional infliction of emotional distress claim required that the district court accept the jury's findings of fact underlying that verdict, and that this in turn would require finding for her on her parallel "hostile workplace environment" Title VII claim. Her general premise is correct: where common issues of fact are raised in parallel Title VII claims triable to the court and pendent state tort claims triable to a jury, the jury's findings on those issues are binding on the court sitting as trier of fact on the parallel claims. *Lytle v. Household Mfg., Inc.,* 494 U.S. 545 (1990). Her conclusion fails here, however.

For the reasons discussed in Part II, it is now established that Walker's state-law claim against Sullair was one of direct, not vicarious, liability. That claim has now been found insufficiently supported by the evidence to support the jury's verdict upon it. Whether under the circumstances there were dispositive common issues in the Title VII claim and the state-law claim of direct liability may be questionable, but in any event is now irrelevant. Because the jury's verdict has now been found unsupported as a matter of law by sufficient evidence to establish the only viable claim in the case, any findings embodied in that verdict could not be held binding on the district court on the Title VII claim.

**\*5** Reviewing those findings independently of any such preclusive effect, they are not clearly erroneous in view of the conflicting evidence respecting Sullair's conduct in investigating and following up on Walker's charges. Consequently, we must affirm the district court's dismissal of the Title VII claim against Sullair.

*AFFIRMED IN PART; REVERSED IN PART.*

C.A.4 (N.C.),1991.
Walker v. Sullair Corp.
946 F.2d 888, 1991 WL 195754 (C.A.4 (N.C.))

END OF DOCUMENT